382 F.2d 366
 INTERNATIONAL TELEPHONE AND TELEGRAPH CORPORATION, a Maryland Corporation, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
Local 400, International Union of Electrical, Radio & Machine Workers of America, AFL-CIO, Intervenor,
Professional Employees of I.T.T. Federal Laboratories, a Division of International Telephone and Telegraph Corporation, Intervenor.
 No. 16012.
 United States Court of Appeals Third Circuit.
 Argued March 28, 1967.
 Decided July 31, 1967.
 Rehearing Denied September 25, 1967.
 
 COPYRIGHT MATERIAL OMITTED Thomas L. Morrissey, Newark, N. J. (Carpenter, Bennett & Morrissey, Newark, N. J., Thomas E. Walsh, Jr., Newark, N. J., Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., on the brief), for petitioner.
 Solomon I. Hirsh, N. L. R. B., Washington, D. C. (Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Marion Griffin, Atty., N. L. R. B., on the brief), for respondent.
 
 
 1
 Vincent J. Apruzzese, Newark, N. J., for intervenor-Professional Empls.
 
 
 2
 Sidney Reitman, Newark, N. J. (Kapelsohn, Lerner, Leuchter & Reitman, Newark, N. J., on the brief), for intervenor Local 400.
 
 
 3
 Before HASTIE and SEITZ, Circuit Judges, and BODY, District Judge.
 
 OPINION OF THE COURT
 
 4
 HASTIE, Circuit Judge.
 
 
 5
 This case is here on a petition by International Telephone and Telegraph Corporation to review, and a cross-petition by the National Labor Relations Board to enforce, a decision and order of the Board. 159 N.L.R.B. No. 145. The Board found that the petitioner had committed unfair labor practices within section 8(a) (5) and (1) of the National Labor Relations Act,[1] (1) by withdrawing recognition from and refusing to bargain with Local 400, International Union of Electrical, Radio & Machine Workers, AFL-CIO, as representative of the professional employees in the engineer-technician unit, (2) by refusing to disclose to the union certain data necessary to the union in the performance of its role as bargaining agent, and (3) by entering into and conducting negotiations with a determination to avoid an agreement. The Board also found that the petitioner had violated section 8(a) (1) of the Act by unlawfully employing threats and promises in soliciting two striking employees to abandon the strike. Accordingly, the order here in controversy was issued requiring the petitioner to cease and desist from these practices and to take appropriate affirmative action, including posting of notices.
 
 
 6
 In 1951, Local 400 petitioned the Board for a representation hearing to be conducted within the framework of three theretofore-recognized bargaining units of the petitioner's employees; a shop-maintenance unit, a clerical-drafting unit, and an engineer-technician unit. A dispute arose whether the technicians in the engineer-technician unit were professional employees within the terms of the Act and thus should be included in that unit. The Board ruled that the technicians were properly so included, whether "professionals" or not, because of the similarity of working conditions, integration of work and parallel bargaining history of the technicians and the engineers. The Board also found that professional employees constituted a majority of workers within the unit regardless of classification of the technicians. Federal Telecommunications Laboratories, Inc., 1951, 92 N.L.R.B. 1395.
 
 
 7
 At that time, the policy of the Board was to deny professionals a separate vote as to their choice of a collective bargaining representative where they constituted a majority of such a mixed unit. Thus, although the engineer-Technician unit selected Local 400 as its bargaining representative, no separate vote was ever held among the engineers, despite the petitioner's objection. This was in contravention of section 9(b) (1) of the Act, 29 U.S.C. § 159(b) (1), which reads in part: "The Board shall not * * * decide that any unit is appropriate for such purposes if such unit includes both professional employees and employees who are not professional employees unless a majority of such professional employees vote for inclusion in such unit".
 
 
 8
 Local 400 was granted recognition and collective bargaining ensued. Thereafter, for thirteen years the petitioner maintained a continuous bargaining relationship with the union as the representative of each of the three units. Bargaining agreements were executed in 1951, 1952, 1954, 1956 and 1959. A Strike Settlement Agreement was entered into in 1961 and expired in September, 1964. Upon failing to reach a new agreement with the petitioner, the union struck on September 9, 1964. Although negotiations continued, no accord was reached.
 
 
 9
 At this juncture, for the first time since 1951, the representative status of the union was challenged. On October 7, the professional employees filed a decertification petition with the Board, requesting that engineers and chemists no longer be represented by Local 400. One day later, the petitioner filed election petitions for both the mixed unit and the professional employees. At the same time, it notified the union that it was withdrawing recognition from Local 400 as bargaining representative of the professional employees. On October 9, Local 400 filed unfair labor practice charges with the Board alleging the Petitioner's refusal to supply certain data which the union considered necessary for proper collective bargaining and also averring the petitioner's intent to avoid agreement. These charges were later amended to allege as additional wrongs the petitioner's withdrawal of recognition of the union as the representative of the professional employees and certain threats and promises made by the petitioner to specific striking professional employees.
 
 
 10
 The Board dismissed the election petitions on the ground that they could not be considered pending disposition of the unfair labor practice charges. Thereafter, the Board handed down the Decision and Order contested here.
 
 WITHDRAWAL OF RECOGNITION OF THE UNION
 
 11
 The Board found that the petitioner's withdrawal of recognition of the union as representative of the professional employees violated section 8(a) (5) and (1) of the Act. In reaching its decision, the Board assumed that the failure to provide a separate election for the professional employees in 1951 made that election illegal. See Leedom v. Kyne, 1958, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed. 2d 210. But to concede that point is not to say that every unit composed of professionals and non-professionals originally formed without a separate election is invalid forever. Though section 9(b) (1) prohibits the Board from designating a mixed unit without holding the requisite election of professionals, nothing in the language of the Act prohibits the relevant parties from maintaining and recognizing such a unit consensually. Retail Clerks Union Local 324 (Vincent Drugs), 1963, 144 N.L.R.B. 1247. In our view such a consensual arrangement is presented here. At no time between 1951 and 1964 did either the petitioner or the professional employees challenge the unit or seek its decertification. The petitioner could have brought the question of alleged improper certification to a head immediately by refusing to bargain in 1951 and litigating the issue before the Board and the courts in an unfair labor practice proceeding. More significantly, even after the 1958 decision in Leedom v. Kyne, supra, which put the parties on notice that the original certification was made in error, they negotiated and entered into new contracts in 1959 and 1961 without questioning the composition of the unit. The Board reasonably found that this conduct constituted consent on the part of both parties to a mixed bargaining unit consisting of professional and non-professional employees. The rationality of that conclusion is further supported by the fact that even before 1951 an engineer-technician group had existed and had functioned as a consensual unit for collective bargaining between the petitioner and the union which then represented the employees. In these circumstances, the error in the original determination of the bargaining unit does not justify the present refusal to bargain with it.[2]
 
 
 12
 Nor can it be said that the petitioner's refusal to bargain was grounded on and justified by good-faith doubt as to the union's majority within the existing unit. At the time recognition was withdrawn 216 of the 345 engineers had returned to work, but more than a majority of the engineer-technician unit remained on strike. And, as the petitioner has admitted, the filing of a decertification petition by a group within a recognized union is not a valid excuse for refusal to bargain with that union. The Board permissibly found that the petitioner's refusal to bargain with Local 400 as representative of the entire group of employees in the engineer-technician unit constituted an unjustified disruption of the bargaining process violative of section 8(a) (5) and (1).
 
 FAILURE TO DISCLOSE DATA
 
 13
 The bargaining history prior to the strike of September 9, 1964, discloses that the issue of labor costs, especially fringe benefits, was of vital concern to both the petitioner and the union. The petitioner continually maintained that in order for it to remain "competitive" the cost of fringe benefits must be reduced, and that contracts were being lost because the fringe benefit costs of its competitors were lower. The union requested data showing the relation between fringe benefits and bidding for new contracts and information showing the contracts that had been lost because of high fringe benefit costs. The petitioner suggested that the union "write a letter to the company, and they would give it to counsel for review". Although no letter was written until October 13, four days after the unfair labor practice charges were filed, the petitioner persisted in its refusal to disclose any financial data regarding its competitive position and corresponding labor costs.
 
 
 14
 Good-faith bargaining requires that relevant factual statements made during the course of collective bargaining be supported, on request, by available proof as to their accuracy. NLRB v. Truitt Manufacturing Co., 1956, 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027. Certainly it cannot be contended that the information sought by the union was irrelevant to its function as bargaining agent. Indeed, the petitioner does not deny relevancy. In our view, failure to honor the request for disclosure of relevant data in this case was a clear violation of the Act. Puerto Rico Telephone Co. v. NLRB, 1st Cir., 1966, 359 F.2d 983; Curtiss-Wright Corporation, Wright Aeronautical Division v. NLRB, 3d Cir., 1965, 347 F.2d 61.
 
 
 15
 We have considered the petitioner's argument that the union's failure to put its request for information in writing until after the unfair labor practice charges had been filed shows that the earlier oral requests for such data were not made in good faith and were merely "to set the Company up" for an unfair labor practice charge. This argument is without merit. No rule requires that requests for information be in writing. The fact that no letter was written until October must be considered in the light of various delaying tactics employed by the petitioner, among them a promise that the company comptroller would come to a bargaining session to answer questions pertaining to financial data. The comptroller never appeared.
 
 
 16
 Finally, the petitioner did not meet its obligation of disclosure by providing some of the requested data. The petitioner was obliged to make full disclosure of the data upon which its assertions were based. NLRB v. Western Wirebound Box Co., 9th Cir., 1966, 356 F.2d 88; Curtiss-Wright Corporation v. NLRB, supra.
 
 
 17
 FAILURE TO DISCLOSE BLANKET SENIORITY INFORMATION AS TO NON-UNIT EMPLOYEES
 
 
 18
 Under the terms of the collective bargaining agreement, employees not within the bargaining unit could, under certain circumstances, be transferred into the unit, receiving seniority credit for time not within the unit. Thus, the transfer of a non-unit employee could conceivably "bump" a unit employee down the seniority ladder. In fact, such a situation occurred in December of 1963. The union thereafter requested information regarding seniority status of the transferred employee as well as blanket seniority information as to other employees eligible for transfer into the unit. The company stipulated that the only information the union would receive would be as to employees already transferred, and that this information would be published in the company's semi-monthly personnel bulletin. This publication was distributed two months after the transfer. The union's request for blanket seniority information was not met until October of 1964. The Board found that failure to provide this information for a nine-month period violated section 8(a) (5) and (1).
 
 
 19
 The major question here is whether such information was relevant to the performance of the union's obligations under the Act. We have concluded that knowledge of seniority data of non-unit personnel before their transfer into the unit was imminent has not been shown to have been relevant to the union's performance of its duties. We realize, of course, that a union is entitled to information necessary to prosecute grievances. NLRB v. Acme Industrial Co., 1967, 385 U.S. 432, 87 S.Ct. 565, 17 L.Ed.2d 495. But we see no reason why the petitioner's disclosure obligation cannot be met by furnishing seniority data of an individual non-unit employee shortly before his transfer into the unit. Imparting individual seniority data at this time would not place the union in any worse position than it would be if it was permitted to obtain comprehensive data for all employees eligible before any transfers were contemplated.
 
 
 20
 Similarly, it has not been established that the union needed such information in order to "administer" the collective bargaining agreement. The Board theorizes that without such information the union cannot perform its function of "counselling and advising unit employees of their rights and status under the contract". But it is not indicated how the rights and status of an employee might be affected before a transfer into the unit should become imminent. Indeed, since transfer cannot occur until certain conditions precedent are met, long-range predictions of transfers must be speculative.
 
 
 21
 The cases cited to us by the Board for the proposition that the union is entitled to blanket seniority information are inapposite. NLRB v. Gulf Atlantic Warehouse Co., 5th Cir., 1961, 291 F.2d 475; Boston Herald-Traveler Corp. v. NLRB, 1st Cir., 1955, 223 F.2d 58; NLRB v. New Britain Machine Co., 2d Cir., 1954, 210 F.2d 61. In those cases, requests for seniority data, limited to unit employees, were linked to wage claims, and thus were "presumptively relevant." Curtiss-Wright Corporation v. NLRB, supra; Boston Herald-Traveler Corp. v. NLRB, supra. No wage claims supported the demand for blanket seniority data here and the demand covered non-unit employees.
 
 
 22
 In these circumstances and on the present record we hold that the petitioner's failure for a nine-month period to disclose blanket seniority information concerning non-unit employees who might, at some undetermined time in the future, be transferred into the unit was not an unfair labor practice. However, the union is entitled to be informed of the seniority status of a non-unit employee about to be transferred in order that it may detect possible contract infractions and, if appropriate, institute grievance procedures. We leave open the question whether, on a different showing blanket seniority data for non-unit employees must be supplied.
 
 
 23
 REFUSAL TO DISCLOSE MERIT-REVIEW EVALUATION DATA
 
 
 24
 The collective bargaining agreement provided for merit increases for professional employees. The total sum to be used for such increases was divided into two parts. Two-thirds of it was to be allocated upon the basis of company recommendations as to recipients and the amount each was to receive. Discussions as to these recommendations between the petitioner and the union were mandatory. If the parties could not agree, the company had the right to put its proposals into effect unilaterally. As to the second part, consisting of the remaining one-third of the total, a board composed of both union and company representatives was to "review" recommendations forwarded by the union. Unresolved disputes as to allocation of this portion of the fund were to be submitted to arbitration.
 
 
 25
 The union demanded disclosure of the factors that the petitioner had used in recommending distribution of the first two-thirds of the fund. The petitioner refused to comply with this request. The Board ordered the petitioner to turn over such information. We agree that such data should have been provided.
 
 
 26
 Since merit payments are in fact "wages," information relating to such payments is "presumptively relevant." Curtiss-Wright Corporation v. NLRB, supra. The union, under the terms of the collective bargaining agreement, had the right to discuss the recommendations of the petitioner in an effort to influence the petitioner's judgment. We do not see how this prerogative could be exercised effectively without knowing the basis of the petitioner's suggestions. Moreover, the union was entitled to be advised of these factors as a guide to the exercise of its right of recommendation as to the remaining one-third portion of the fund.
 
 
 27
 The petitioner claims that the union waived its right to such information, citing for this proposition certain bargaining history. Under the 1959 collective bargaining agreement, the petitioner was required to furnish the union with blank evaluation sheets used by the petitioner in preparing recommendations for merit increases. Later bargaining contracts did not require that these sheets be turned over. The petitioner views this as a contractual waiver of the right of the union to have access to relevant data.
 
 
 28
 Waiver of a statutory right to information, within the provisions of section 8(d) of the Act, 29 U.S.C. § 158(d), must be in "clear and unmistakable language". Timken Roller Bearing Co. v. NLRB, 6th Cir., 1963, 325 F.2d 746, cert. denied 376 U.S. 971, 84 S.Ct. 1135, 12 L.Ed.2d 85. Silence in the bargaining agreement is insufficient to constitute such waiver. Thus, the petitioner will be required to turn over the data relied upon in recommending allocation of the two-thirds portion of the merit fund when the union so requests.
 
 
 29
 BAD FAITH BARGAINING WITH INTENT TO AVOID AGREEMENT
 
 
 30
 The Board found that the petitioner violated section 8(a) (5) and (1) of the Act "by entering into and conducting negotiations with a fixed determination to avoid, rather than reach, an agreement. This court must determine whether that finding is supported by substantial evidence on the entire record. 29 U.S.C. § 160(e).
 
 
 31
 The Board points initially to two incidents involving Carey, the petitioner's labor relations manager, and LaGana, one of the union's chief stewards. In March of 1964, during a conference concerning the resolution of grievances, Carey and LaGana became involved in a disagreement as to the substance of a grievance. Carey told LaGana that LaGana was "completely and absolutely unreasonable, that the union contract had clauses that management could no longer live with, and in fact, that the company was preparing a set of proposals of such a nature that it would take a fourteen week strike to condition * * * [the union] to accept them, and if Mr. LaGana was on the committee, it would take a twenty-eight week strike". During a subsequent argument Carey replied in the affirmative to LaGana's question, "you mean you are sending out proposals just like you told us * * * and you are going to put us out in the street for fourteen weeks?"
 
 
 32
 As the trial examiner found, negotiations over the new contract followed the course Carey had predicted. The petitioner proposed large reductions in fringe benefits, yet, as previously pointed out, refused to substantiate the contention that such reductions were needed in order to maintain its competitive position. Even when the petitioner reduced some of its demands, others were retained as "musts", manifesting a "take-it-or-leave-it" attitude. The dropping of some demands was conditioned on union acceptance of others "if there was no strike".
 
 
 33
 The petitioner maintains that the events relied upon by the Board are isolated, at most show a "give and take" attitude, and do not show an overall intent to avoid agreement within the meaning of NLRB v. Katz, 1962, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230. From the record we cannot say that the Board was arbitrary in its finding. Although we, like a minority of the Board, might have reached a different conclusion given the same facts, our power of review is not such that we may, on the present record, reverse the decision of the Board as inadequately supported by the evidence.
 
 
 34
 SOLICITATIONS OF TWO STRIKING EMPLOYEES TO RETURN TO WORK
 
 
 35
 It is undisputed that the petitioner's laboratory director solicited two striking engineers to return to work. Such solicitations were accompanied with promises such as "the company would remember its loyal employees at merit review time" and "if you are one of the first employee(s) to come in during the strike you can expect a raise and a promotion".
 
 
 36
 The petitioner claims that such events are unrelated to any other unfair labor practice finding and, therefore, no remedial order is warranted. But it is not necessary that such occurrences be related to other unfair labor practices. International Ladies Garment Workers Union, AFL-CIO and Twin-Kee Manufacturing Co., Inc., 1961, 130 N.L.R.B. 614. And even if such a requirement existed it could not be found on this record that these solicitations were unrelated to the petitioner's withdrawal of recognition from the union as representative of the professional employees. The Board's finding as to illegal solicitation must be upheld.
 
 
 37
 So much of the Board's order as requires the disclosure of blanket seniority data of non-unit personnel will be set aside. The remainder of the order will be enforced.
 
 
 
 Notes:
 
 
 [1]
 29 U.S.C. § 158
 (a) It shall be an unfair labor practice for an employer —
 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
 * * * * *
 (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.
 
 
 [2]
 The Board was careful to point out, in footnote 15 of its opinion, that its "holding here is not to be construed as foreclosing the professionals in the unit from seeking self-determination at an appropriate time * * *; now is not an appropriate time because of the Respondent's unremedied unfair labor practices."