**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

**v.**

**CARDOX DIVISION OF CHEMETRON CORPORATION, Respondent.**

No. 82–3188.

United States Court of Appeals, Third Circuit.

Argued Dec. 13, 1982.

Decided Feb. 2, 1983.

Lawrence Blatnick (argued), W. Christian Schumann, William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., for petitioner.

Alex V. Barbour, Chicago, Ill. (argued), for respondent; Pope, Ballard, Shepard & Fowle, Chicago, Ill., of counsel.

Before HUNTER and GARTH, Circuit Judges, and WEBER,* District Judge.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge:

Pursuant to section 10(e) of the National Labor Relations Act ("Act" or "NLRA"), 29 U.S.C. § 160(e) (1976), the National Labor Relations Board ("Board") has petitioned this court for enforcement of its order issued on September 30, 1981.[1] In its decision accompanying that order the Board held that the Cardox Division of the Chemetron Corporation ("Company") had violated sections 8(a)(1) and 8(a)(5) of the Act, 29 U.S.C. §§ 158(a)(1), (a)(5) (1976), by refusing to bargain with and by withdrawing exclusive recognition of Teamsters Union Local No. 115 ("Union" or "Local 115"). The Board failed, however, to determine under section 9(b) of the Act, 29 U.S.C. § 159(b) (1976), whether the bargaining unit identified by the parties was an appropriate unit for collective bargaining purposes. For that reason we will deny the Board's application for enforcement and will remand this action to the Board for further proceedings consistent with this opinion.

*FACTS*

### A.

The Cardox Division of the Chemetron Corporation is engaged in the manufacture, sale, and distribution of carbon dioxide. The Company operates approximately fifty

---

* Honorable Gerald J. Weber, of the United States District Court for the Western District of Pennsylvania, sitting by designation.

1. The Board's decision and order is reported at 258 N.L.R.B. 1202 (1981).

separate facilities located throughout the United States, including ten manufacturing plants and forty distribution depots. The present controversy arises within the Company's "Eastern Region" which covers the northeastern portion of the United States from the Virginia-North Carolina state line to the Canadian border.

The Company has four regional servicemen in the Eastern Region, each assigned to a designated field service area. These servicemen are Charles Pennington, whose service area includes Virginia, Maryland, and a small part of southern Pennsylvania; James Hurley, whose service area includes eastern Pennsylvania, southern New Jersey, and all of Delaware; Richard Gerber, whose service area includes Bridgeport and New Haven, Connecticut, and the metropolitan New York-Newark area; and Tom Shane, whose service area includes eastern upstate New York, Maine, central New Hampshire, Massachusetts, and a portion of Connecticut. The servicemen work from their homes, primarily answering customers' calls in their service areas. Their work assignments, however, are not limited to their particular assigned service areas, and they are frequently assigned to other areas on a temporary basis.

All four servicemen are paid on a salaried basis and have an identical package of fringe benefits. They are supervised solely by Bernard O'Reilly, the Company's Service Manager for the Eastern Region. He approves their weekly time sheets and expense accounts, authorizes overtime, schedules their vacations, and handles their grievances. Although the servicemen are responsible for installing and maintaining equipment at some of the Company's distribution depots, the depot managers have no authority to direct their hours or work schedule.

**B.**

On June 19 and July 2, 1979, respectively, servicemen Pennington and Hurley signed cards authorizing the Union to represent them for the purposes of collective bargaining. On August 14 two Union representatives met with Dick Wyatt, the Company's Delaware City, Delaware depot manager. They presented him with a letter and recognition agreement and requested that the Company recognize and bargain with the Union as the collective bargaining representative of the field servicemen employed at the facility.[2] Wyatt read the letter, personally checked the authorization cards, and then signed the recognition agreement. The agreement was sent to John Manning, the Company's Director of Employee Relations, who, after making some minor modifications, executed the agreement on August 27, 1979. The unit recognized within the agreement consisted of "field servicemen not included in any other bargaining unit and excluding guards, office clerical and supervisors as defined in the Act, employed by the Employer at [its Delaware City, Delaware] facility." App. 263a–64a.

After some initial correspondence the parties held their first bargaining session on October 17, 1979, but failed to reach an agreement on a contract. A second meeting was later scheduled for December 5, 1979.

Sometime in November, Pennington informed O'Reilly that he no longer wanted to be represented by the Union. Pennington testified that he changed his mind because of a dispute with the union over whether he should work while another union, Teamsters Local 326, was out on strike. At about the same time Pennington began receiving his phone calls at the Company's Suffolk, Virginia depot instead of at Dela-

---

**2.** As of August 1979 both Hurley and Pennington had certain regularized contact with the Company's Delaware City facility. Those contacts consisted of: (1) being classified as working out of the Delaware City depot for the purposes of governmental reports as well as internal personnel files; (2) purchasing parts and tools utilizing credit established by the facility; (3) receiving telephone messages from the facility; and (4) visiting the facility periodically to pick up billing invoices or parts for use in their work, and to straighten up the parts room.

ware City.[3] When O'Reilly informed Hurley of Pennington's decision about the Union, Hurley also decided that he no longer wanted to be represented by Local 115.

A few days before the bargaining session scheduled for December 5, Manning first learned that Pennington and Hurley had advised their supervisor that they no longer wanted to be represented by the Union and that Pennington was now receiving his phone calls at the Suffolk depot. After discussing the matter with counsel, Manning requested that O'Reilly obtain from both Pennington and Hurley confirmation in writing that they no longer desired to be represented by Local 115. In addition, Manning called the attorney for the Union and canceled the December 5 meeting. On December 6 Manning wrote a letter to the Union stating that only one employee, Hurley, now worked in its jurisdictional area[4] and thus "there does not seem to be any reason to cover him under a Local 115 agreement." A few days later the Company received the requested letters from Pennington and Hurley indicating their intention to withdraw from the Union.

*PROCEEDINGS BELOW*

The Union filed an unfair labor practice charge against the Company on December 12, 1979. On January 30, 1980, the General Counsel issued a Complaint and Notice of Hearing alleging that the Company had violated sections 8(a)(1) and 8(a)(5) of the Act by withdrawing exclusive recognition of the Union on December 6, 1979.[5] In its answer the Company denied that it had committed any unfair labor practices.

A hearing was held before an Administrative Law Judge ("ALJ") on July 10, 1980. At that hearing the Company argued that the unit identified by the parties in the voluntary recognition agreement was inappropriate because Pennington and Hurley lacked a community of interest distinct from that of the other servicemen. Alternatively the Company argued that the unit was inappropriate because it had been reduced in size to a single employee by December 6. Finally, the Company asserted that, even if the agreed upon unit was appropriate, at the time it withdrew recognition the Union no longer represented either of the two employees who comprised the purported unit. On September 24, 1980, the ALJ issued a decision in which he accepted the Company's argument that the agreed upon bargaining unit was inappropriate because it did not include all four field servicemen in the Company's Eastern Region. Finding an "overwhelming showing of community of interest," the ALJ held that it was inappropriate to carve out from the four servicemen any unit of less than four. App. at 20a–21a. Having found the unit inappropriate, the ALJ reasoned that the Company could not be held to have violated section 8(a)(5) of the Act and thus recommended that the complaint be dismissed in its entirety.[6] The ALJ did not reach the merits of the Company's other defenses.

On October 16, 1980, the General Counsel filed exceptions to the ALJ's decision with the Board. The Company filed an answering brief but did not file any cross-exceptions to the findings of the ALJ.

On September 30, 1981, the Board issued a decision and order in which it found that the Company had violated sections 8(a)(1)

---

**3.** This change was suggested by O'Reilly because the Delaware City facility had been closed down by the Local 326 strike. O'Reilly testified that he made his suggestion not to remove Pennington from the union's jurisdiction, but rather to prevent him from quitting the Company. App. at 174a–48a.

**4.** Manning testified that he understood the Union's jurisdictional area to be the Wilmington, Camden, and Philadelphia area.

**5.** The complaint also charged that the Company had violated the Act by failing to bargain in good faith with the Union from August 27, 1979. In its decision the Board did not address this issue nor has it been raised before us in this application for enforcement.

**6.** App. at 17a, 21a (citing *United Mine Workers,* 83 N.L.R.B. 916, 920 (1949), *enforced,* 184 F.2d 392 (D.C.Cir.1950), *cert. denied,* 340 U.S. 934, 71 S.Ct. 499, 95 L.Ed. 674 (1951), and *The Duluth Glass Block Store Co.,* 76 N.L.R.B. 1064 (1948)).

and 8(a)(5) of the Act. 258 N.L.R.B. at 1204. The Board disagreed with the ALJ's statement that, "[t]he threshold question presented in this proceeding is whether the . . . unit . . . is appropriate." [7] Instead it held that because the Company voluntarily recognized and bargained with the Union, it was unnecessary for the Board to decide whether an appropriate unit existed. 258 N.L.R.B. at 1203.[8] Quoting from *Arizona Electric Power Cooperative, Inc.,* N.L.R.B. 1132, 1133 (1980), the Board held that it could issue a bargaining order "covering a unit which it could not have initially certified under the Act" when the parties have knowingly and voluntarily bargained over that unit. 258 N.L.R.B. at 1203.

Having disposed of the Company's argument that the unit was inappropriate, the Board then addressed the Company's contention that it could withdraw recognition on December 6 because the Union no longer enjoyed the support of the two employees in the unit. The Board determined that, because a reasonable time for bargaining had not expired, the Union continued to enjoy an irrebuttable presumption of majority status when the Company withdrew recognition. Thus the Board held that the Company's refusal to bargain violated section 8(a)(1) and section 8(a)(5) of the Act.

On October 23, 1981, the Company filed a "Motion for Reconsideration, Reopening of the Record and for Stay of Board Decision and Order." App. at 37a. The Company asked the Board to reconsider its decision and to review new evidence on whether the agreed upon unit had been permanently reduced to a single employee, if not prior to the time recognition was withdrawn, at least since the time of the hearing before the Administrative Law Judge in July 1980.[9] On February 4, 1981, the Board denied the Company's motion as "lacking in merit." This action for enforcement followed.

## DISCUSSION

### I.

■ In asking this court to deny enforcement of the Board's order, the Company asserts that the Board exceeded its statutory authority by refusing to make a unit determination as required by section 9(b) of the Act. The Company argues that absent such a determination, the Board had no statutory authority to find that the Company committed unfair labor practices under sections 8(a)(1) and 8(a)(5). Furthermore, the Company contends that the unit identified in the voluntary recognition agreement is in fact inappropriate because (1) the unit consists of only two of the four field servicemen in the Company's Eastern Region and thus represents an arbitrary grouping, or (2) the unit has been permanently reduced to one employee and thus contravenes established Board policy.[10]

7. App. at 17a–18a.

8. The Board stated: "To the extent that *The Duluth Glass Block Store Company,* 76 NLRB 1064 (1948), may be read to the contrary, it is overruled." 258 N.L.R.B. at 1203 n. 2.

9. The Company argued that since late 1979, there had been a substantial increase in Pennington's contacts with the Suffolk facility due to the increase in the volume of business in the area served by the Suffolk distribution depot. During the same period Pennington's contacts with the Delaware facility had dropped off substantially. In a sworn affidavit Pennington stated that from July 1980 to October 1981 his only contact with the Delaware City depot had been three phone calls. The Company argued that "[b]ased on the evidence already contained in the record, as well as that set forth in Pennington's sworn affidavit, it is perfectly clear that regardless of whatever tenuous connec-

tions might have existed between Pennington and the Delaware City facility at the time of voluntary recognition, those connections have since been permanently severed and by no stretch of the imagination can he now be considered as included in a unit of servicemen employed 'at' Delaware City." App. at 44a.

10. In its brief the Board argues that under § 10(e) of the Act, the Company is precluded from raising the one-man unit issue before us because of its failure properly to raise the issue before the Board. Section 10(e) of the Act provides:

No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the Court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.

In response the Board asserts that voluntary recognition agreements are "a favored element of national labor policy," *NLRB v. Broadmoor Lumber Co.,* 578 F.2d 238, 241 (9th Cir.1978), and that having entered into such an agreement, an employer should not be allowed to unilaterally repudiate its recognition of a union. The Board contends that to hold otherwise "would fly in the face of [its] statutory obligation to promote stability in bargaining relationships." 258 N.L.R.B. at 1203. Thus the Board argues that, in an unfair labor practice proceeding involving a voluntary recognition agreement, it is not required to determine that the agreed upon unit is appropriate.[11]

II.

▪ Section 9(b) of the NLRA states in relevant part:

The Board shall decide *in each case* whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this Act, the unit appropriate for purposes of collective bargaining shall be the employee unit, craft unit, plant unit, or subdivision thereof.

29 U.S.C. § 159(b) (1976) (emphasis added). Although under that provision the Board has broad discretion when making a unit determination,[12] the section's language expressly requires that the Board make a decision "in each case." *Big Y Foods, Inc. v. NLRB,* 651 F.2d 40, 45–46 (1st Cir.1981); *Long Island College Hospital v. NLRB,* 566 F.2d 833, 840–41 (2d Cir.1977), *cert. denied,* 435 U.S. 996, 98 S.Ct. 1647, 56 L.Ed.2d 84 (1978); *Memorial Hospital of Roxborough v. NLRB,* 545 F.2d 351, 360 (3d Cir.1976); *Crown Zellerbach Corporation,* 246 N.L.R.B. 202, 203 (1979); *see Allegheny General Hospital v. NLRB,* 608 F.2d 965, 969 (3d Cir. 1979). That legislative command is mandatory and constitutes a non-delegable duty imposed on the Board by Congress. *Roxborough,* 545 F.2d at 360. Accordingly the Board abdicates its statutory duty when it fails to exercise its discretion under section 9(b).

29 U.S.C. § 160(e) (1976). The ALJ did not reach the one-man unit issue. The Board argues that because the Company did not raise the one-man unit issue by filing cross-exceptions to the ALJ's decision, it is now barred from raising that issue before us.

Although not necessary to our disposition of this case, we feel that the one-man unit issue is properly raised before us. The purpose of § 10(e) is to insure against piecemeal appeals to the courts by requiring that the parties first give the Board an opportunity to rule upon all material issues in a case. *NLRB v. GAIU Local 13–B,* 682 F.2d 304, 311 (2d Cir.1982). Where the Board overturns a ruling of the ALJ favorable to a party and that party timely moves for reconsideration by the Board on an alternative theory that had been raised before the ALJ but left undecided, we find that the purpose of § 10(e) has been served. *See Woelke & Romero Framing Inc. v. N.L.R.B.,* 456 U.S. 645, 665, 102 S.Ct. 2071, 2083, 72 L.Ed.2d 398 (1982); *International Ladies' Garment Workers' Union v. Quality Mfg. Co.,* 420 U.S. 276, 281 n. 3, 95 S.Ct. 972, 975 n. 3, 43 L.Ed.2d 189 (1975); *GAIU Local 13–B,* 682 F.2d at 312; *Hedstrom Co. v. NLRB,* 629 F.2d 305, 312 (3d Cir.1980) (en banc), *cert. denied,* 450 U.S. 996, 101 S.Ct. 1699, 68 L.Ed.2d 196 (1981). *But cf. NLRB v. Local Union No. 74,* 471 F.2d 43, 46 (7th Cir. 1973) (section 10(e) barred consideration by court of appeals of issues raised for the first time in the Union's motion for reconsideration).

**11.** In its brief, the Board distinguishes voluntary recognition cases from representation proceedings under § 9. 29 U.S.C. § 159 (1976). In the latter proceedings the Board is asked to define an appropriate unit, to direct an election, or to certify the results of an election previously held. In the instant case, however, the Board argues "such Section 9 proceedings were obviated because the parties themselves voluntarily reached agreement concerning the boundaries of an appropriate bargaining unit. Rather, the case arose in an unfair labor practice case presenting the issue of whether the employer was free ... to repudiate its own agreement concerning the appropriateness of the bargaining unit." Brief of the National Labor Relations Board at 17–18.

**12.** *Allied Chemical Alkali Workers of America v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 171, 92 S.Ct. 383, 393, 30 L.Ed.2d 341 (1971); *NLRB v. Keystone Pretzel Bakery, Inc.,* 696 F.2d 257 (3d Cir.1982) (en banc). "It has often been repeated that the NLRB need not select the most appropriate unit—any unit that is an appropriate one will do, even if there are several better possible units." *NLRB v. Saint Francis College,* 562 F.2d 246, 249 (3d Cir.1977) (citing *NLRB v. Western & Southern Life Insurance Co.,* 391 F.2d 119, 122 (3d Cir.), *cert. denied,* 393 U.S. 978, 89 S.Ct. 445, 21 L.Ed.2d 439 (1968)).

In *Memorial Hospital of Roxborough v. NLRB,* 545 F.2d 351 (3d Cir.1976), we denied enforcement of a Board order finding unfair labor practices under sections 8(a)(1) and 8(a)(5) because the Board failed to make a unit determination as required by section 9(b). In that case the Board had extended complete deference to a state agency's prior determination of what was a proper unit for the purposes of collective bargaining among Memorial Hospital's maintenance department employees.[13] In denying enforcement we stated:

> Congress has ... mandated Board determination "in each case" of "the unit appropriate" for collective bargaining. Thus the statute requires the Board to exercise its discretion as to an appropriate unit in each and every case. This responsibility can neither be delegated to nor discharged by a state agency where Congress has sought to create a national labor policy by vesting this discretion in a national labor board. *La Crosse Telephone Corp. v. Wisconsin Employment Relations Board,* 336 U.S. 18, 24–27, 69 S.Ct. 379 [382–383], 93 L.Ed. 463 (1948). Here, however, the Board abdicated its required duty by accepting the [state agency's] determination without exercising its own mandated discretion. In so doing the Board "overstep[ped] the law." *Packard Motor Car Co. v. NLRB,* [330 U.S. 485,] 491, 67 S.Ct. 789, 793, 91 L.Ed. 1040 (1947)].

*Roxborough,* 545 F.2d at 360; *see Allegheny General Hospital v. NLRB,* 608 F.2d 965, 969 (3d Cir.1979); *cf. Big Y Foods,* 651 F.2d at 46 (a conclusive presumption that a unit is appropriate is invalid under section 9(b)).

■ Our reasoning in *Roxborough* applies with equal force in the instant case. Section 9(b) requires the Board to exercise its discretion and determine that the unit agreed upon by the parties is an appropriate unit for bargaining purposes. The Board can not simply defer to a voluntary agreement entered into by an employer and a union without making any assessment that the unit identified within the agreement is proper. To do so oversteps the law.[14]

We do not think that our decision in *International Telephone and Telegraph Corp. v. NLRB,* 382 F.2d 366 (3d Cir.1967), cert. denied, 389 U.S. 1039, 88 S.Ct. 777, 19 L.Ed.2d 829 (1968), leads to a contrary result. In that case the Board conducted an original unit certification proceeding and election in 1951. One of the units certified was an engineer-technician unit. Under its then applicable policies the Board ruled that the technicians were properly included within the unit despite the fact that they might be "professionals." The Board reached its conclusion because of the similarity of working conditions, integration of work, and parallel bargaining history of the technicians and the engineers. The Board also found that professional employees constituted a majority of workers within the unit regardless of how the technicians were classified. 382 F.2d at 369. The company did not seek review of the Board's determination in the courts. Over the next thirteen years the parties entered into a series of collective bargaining agreements. Following a strike in 1964, however, the company withdrew recognition of the union as the representative of the professional employees. After a complaint was brought by the General Counsel the Board determined

---

**13.** *Roxborough* involved a dispute arising after passage of the 1974 amendments to the NLRA. Act of July 26, 1974, Pub.L. No. 93–360, 88 Stat. 395. Prior to 1974 the rights of non-profit hospital employees to organize and bargain collectively were matters of state law. The 1974 amendments, however, brought non-profit hospitals and their employees within the coverage of the NLRA and made them subject to the jurisdiction of the Board. 545 F.2d at 353.

**14.** In the analogous setting involving consent elections under § 9(c)(4) of the Act, the courts have continually held that the Board is not bound to the terms of the parties' unit stipulation if those "terms violate statutes or national labor policy." *Cappa v. Wiseman,* 659 F.2d 957, 960 (9th Cir.1981); *accord International Union of Electrical, Radio and Machine Workers v. NLRB,* 418 F.2d 1191, 1199 (D.C.Cir. 1967); *Uyedo v. Brooks,* 365 F.2d 326, 330–31 (6th Cir.1966); *Tidewater Oil Company v. NLRB,* 358 F.2d 363, 366 (2nd Cir.1966).

that the company's actions violated sections 8(a)(1) and 8(a)(5) of the Act. 159 N.L.R.B. 1757 (1966). The Board recognized that its original certification might have been illegal, *see Leedom v. Kyne,* 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958),[15] but held that, because the unit was not "inherently inappropriate," 159 N.L.R.B. at 1764, it could still find the employer's refusal to bargain over the unit violated the Act. This court enforced the Board's order. We recognized that the original certification election might well have violated section 9(b)(1) of the Act.

But to concede that point is not to say that every unit composed of professionals and non-professionals originally formed without a separate election is invalid forever. Though section 9(b)(1) prohibits the Board from designating a mixed unit without holding the requisite election of professionals, nothing in the language of the Act prohibits the relevant parties from maintaining and recognizing such a unit consensually. *Retail Clerks Union Local 324 (Vincent Drugs),* 1963, 144 N.L.R.B. 1247. In our view such a consensual arrangement is presented here.

382 F.2d at 370. We concluded that while the Board certification election might have been improper, in a situation where the "professional" group had existed and had functioned as a member of a consensual unit for collective bargaining purposes and where even after notice of illegality, the parties continued for a period of over thirteen years to engage voluntarily in collective bargaining, any error in the original determination of the bargaining unit could not justify a refusal to bargain. *Id.* Thus *International Telephone and Telegraph* is consistent with our holding that the Board must determine that the unit agreed to by the parties is not contrary to the Act or Board policy.[16]

## III.

■ We recognize that the fact that the parties have entered into a voluntary agreement changes the nature of the Board's inquiry under section 9(b). As we stated in *Roxborough:*

[W]here the parties have stipulated to the appropriateness of a unit, the Board limits its review to determining that the unit

---

**15.** In *Leedom v. Kyne* the Supreme Court held that the Board acted outside of its statutory power when it included within a unit both professional and non-professional employees without determining whether a majority of the professional employees would "vote for inclusion in such [a] unit," 29 U.S.C. § 159(b)(1) (1976). 358 U.S. at 188–89, 79 S.Ct. at 183–184.

**16.** The Board cites to *Osteopathic Hospital Founders Association v. NLRB,* 618 F.2d 633 (10th Cir.1980), where the Tenth Circuit appears to read *International Telephone & Telegraph* as only requiring agreement between the employer and the union over the definition of a unit as the prerequisite to finding an 8(a)(5) violation without further establishing acquiescence by the professional employees in their inclusion within the unit. We do not accept the Tenth Circuit's overly broad interpretation of *International Telephone & Telegraph.* Cf. *Valley View Hospital,* 252 N.L.R.B. 1146, 1147 (1980) (despite stipulation by the parties, certification of a unit including professional and non-professional is improper absent a vote by the professional employees in favor of such inclusion); *see also NLRB v. St. Luke's Hospital Center,* 551 F.2d 476, 483 (2d Cir.1976). We also do not find persuasive the other cases cited by the Board in support of its position that it is not required to make a unit

determination in the instant case. For example in *Lyon & Ryan Ford, Inc.,* 246 N.L.R.B. 1 (1979), *enforced,* 647 F.2d 745 (7th Cir.1981), the Board *did* make a unit determination, finding the unit of auto mechanics for which the Union sought representation to be an appropriate bargaining unit. 246 N.L.R.B. at 3.

In *Arizona Electric Power Cooperative, Inc.,* 250 N.L.R.B. 32 (1980), the Board stated that it "may appropriately issue a bargaining order covering a unit which it could not have initially certified under the Act, but concerning which the parties have knowingly and voluntarily bargained." 250 N.L.R.B. at 1133. The Board was careful to point out, however, that the responsibility to bargain in that case arose from the existence of a collective bargaining agreement entered into between the parties, not from a separate voluntary agreement over which employees should be in the unit. 250 N.L.R.B. at 1134 n. 10; *see Carolina Telephone and Telegraph Co.,* 258 N.L.R.B. 1387, 1388 (1981); *cf. Supreme Sugar Company,* 258 N.L.R.B. 243, 240 & n. 3 (1981) (absent a determination that a unit containing guards was appropriate, the Board was precluded from finding a § 8(a)(5) violation).

does "not contravene the provisions or purposes of the Act [NLRA] or well settled Board policies." *Otis Hospital, Inc.,* 219 NLRB No. 55 (1975). *See also St. Joseph Hospital & Medical Center,* 219 NLRB No. 161 (1975). *Roxborough,* 545 F.2d at 360 n. 11; *cf. International Telephone and Telegraph Corp.,* 159 N.L.R.B. 1757, 1764 (1966) (unit not inherently inappropriate), *enforced,* 382 F.2d 366 (3d Cir.1967), *cert. denied,* 389 U.S. 1039, 88 S.Ct. 777, 19 L.Ed.2d 829 (1968). Thus in a voluntary recognition case, section 9(b) requires only that the Board make a determination that the unit agreed upon by the parties is not inconsistent with the National Labor Relations Act and past Board policy. In the instant case, however, the Board made no such determination. Absent such a finding, the Board lacks the statutory power to hold that the Company's withdrawal from the voluntary bargaining agreement constitutes a section 8(a)(5) violation. *Supreme Sugar Company,* 258 N.L.R.B. 243, 245 (1981).[17]

Our reading of the statute is consistent with the Act's underlying purpose of protecting the interests of all employees, as well as the interests of unions and employers. Review of voluntary recognition agreements by the Board prevents employers and unions from mistakenly agreeing to a unit which does not adequately protect the rights of all the workers in the workplace. Review also prevents a union and an employer, through a voluntary agreement, from manipulating the scope and composition of a bargaining unit for their own purposes. *Cf. NLRB v. St. Luke's Hospital Center,* 551 F.2d 476, 483 (2d Cir.1976) (deference to state unit determination frustrates policy of employee self-determination). "The National Labor Relations Board is not just an umpire to referee a game between an employer and union. It is also a guardian of individual employees. Their voice, though still and small, commands a hearing." *Shoreline Enterprises of America, Inc. v. NLRB,* 262 F.2d 933, 944 (5th Cir.1959). By exercising its discretion under section 9(b), the Board insures the protection of individual employees' rights to self-organization and freedom of choice. Safeguarding those rights in turn effectuates the collective bargaining process. *Kalamazoo Paper Box Corp.,* 136 N.L.R.B. 134, 137 (1962); J. Abodeely, *The NLRB and the Appropriate Bargaining Unit* 2 (1971).

This court recognizes the value of voluntary recognition agreements in the collective bargaining process. We also adhere to the basic policy that a company and a union must be held to their agreements if those agreements are consistent with the Act. *See NLRB v. Lyon & Ryan Ford, Inc.,* 647 F.2d 745, 752 (7th Cir.1981); *Shoreline,* 262 F.2d at 943; *Jerr-Dan Corp.,* 237 N.L.R.B. 302, 303 (1978), *enforced,* 601 F.2d 575 (3d Cir.1979). But we refuse to conclude that these policies compel the Board to merely accept private agreements without first determining whether those agreements are contrary to the Act or established Board policy.

Because the Board did not exercise its discretion as required by section 9(b), it acted outside its authority under the NLRA in issuing a bargaining order to the Company. Accordingly we will deny enforcement and will remand this action to the Board to determine whether the unit agreed upon by the parties is appropriate in light of the requirements of the Act and settled Board policy.[18]

---

17. Section 8(a)(5) of the Act makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees, *subject to the provisions of section 159(a) of this title.*" 29 U.S.C. § 158(a)(5) (1976) (emphasis added). Section 9(a) states: "Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a *unit appropriate for such purposes,* shall be the exclusive represent-atives of all the employees in such unit for the purposes of collective bargaining." 29 U.S.C. § 159(a) (1976) (emphasis added).

18. *We make no finding concerning the appropriateness of the unit originally agreed to by the parties in the instant case.* On remand we would, of course, expect compliance with the directions of the Supreme Court in *NLRB v. Metropolitan Life Insurance Co.,* 380 U.S. 438, 442–43, 85 S.Ct. 1061, 1063–1064, 13 L.Ed.2d

951 (1965), which required disclosure of the basis of the Board's order and a clear indication that the Board has exercised its discretion. *Roxborough,* 545 F.2d at 361–62.