**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 22-3301 and 22-3426
_____

NEW CONCEPTS FOR LIVING, INC.,

v.

NATIONAL LABOR RELATIONS BOARD

New Concepts for Living, Inc.
            Petitioner in No. 22-3301

National Labor Relations Board
            Petitioner in No. 22-3426

_____

On Petition for Review from a decision of the
National Labor Relations Board
NLRB Nos: 1 : 22-CA-187407;
1 : 22-CA-195819; 1 : 22-CA-197088;
1 : 22-CA-205843; 1 : 22-CA-208390
_____

Argued September 28, 2023

Before: KRAUSE, AMBRO, and SMITH, *Circuit Judges*

(Filed: March 4, 2024)

Maurice Baskin     [**ARGUED**]
Emily Carapella
Littler Mendelson
815 Connecticut Avenue NW
Suite 400
Washington, DC 20006
        *Counsel for New Concepts for Living, Inc.*

Ruth E. Burdick
Elizabeth A. Heaney
Joel Heller    [**ARGUED**]
National Labor Relations Board
Appellate and Supreme Court Litigation Branch
1015 Half Street SE
Washington, DC 20570
        *Counsel for the National Labor Relations Board*

_____

OPINION OF THE COURT
_____

**SMITH**, *Circuit Judge*.

New Concepts for Living, Inc. ("New Concepts") seeks review of an order of the National Labor Relations Board ("NLRB" or the "Board") determining that New Concepts engaged in unfair labor practices by pushing to decertify its employees' union. An administrative law judge ("ALJ") dismissed all eight charges against New Concepts. Although the Board affirmed the ALJ's dismissal of three of those charges, the Board reversed his dismissal of five others by a two-to-one vote. New Concepts petitioned for review, and the NLRB cross-petitioned for enforcement. After a thorough review of the record, we hold that the Board majority's five reversals are not supported by substantial evidence. We will therefore grant New Concepts' petition for review and deny the NLRB's cross-application for enforcement.

## I. Factual Background

New Concepts is a nonprofit corporation that provides services for people with disabilities at several facilities located in northern New Jersey. In 2007, the Communications Workers of America, Local 1040 (the "Union"), began representing a bargaining unit of approximately 90 New Concepts employees. The most recent collective bargaining agreement ("CBA") between New Concepts and the Union ("the parties") expired on June 30, 2014. Thereafter, for nearly two years, a series of Union representatives failed to request that New Concepts commence negotiations aimed at reaching a successor agreement. The result of that inactivity was that members were, understandably, dissatisfied with their Union.

In August 2016, the parties began negotiations to reach a successor agreement. Around the same time, momentum was building to decertify the Union. Specifically, New Concepts employee Andre Marshall and several other employees gathered signatures from coworkers on a petition in support of decertification. Although the negotiations that had begun in August did not result in a new CBA, the parties did agree to meet again in late October 2016.

Meanwhile, New Concepts CEO Steve Setteducati spoke at a series of staff meetings in October and answered questions posed by employees. In the wake of those meetings, Marshall filed a decertification petition with the NLRB. New Concepts then informed the Union that it would suspend bargaining, reasoning that the petition gave rise to a good faith doubt that the Union was actually supported by a majority of the unit. The NLRB scheduled a decertification vote which, in turn, led the Union to file an unfair labor practice charge. Filing of the charge blocked further processing of the petition and resulted in an indefinite postponement of the vote. Marshall then chose to withdraw the decertification petition.

On December 28, 2016, New Concepts distributed to its employees a memorandum (the "December Memo") which informed them of their right to resign from the Union. The December Memo began by stating that New Concepts had "received numerous questions" from employees concerning the deduction of union dues from their paychecks. R. 1434. The Memo went on to state that more than two years had passed since the CBA had expired and that the employees' payment of dues remained voluntary. *Id.* The Memo also cautioned that "[employees] have the right to resign from membership in the

4

Union and [from] paying dues at any time, BUT the Union may take the position that [they] can only revoke . . . [dues] deduction authorizations twice a year." That meant, the Memo explained, that if employees chose not to revoke authorization by December 30, "[they] may be forced to pay Union Dues for another 6 months." *Id.* The Memo assured employees that there would be "no reward for stopping Union Dues or punishment for continuing to pay Union Dues." *Id.* Attached to the December Memo was a form letter titled "Resignation/Dues Revocation Letter." R. 1432. Addressed to both the Union and New Concepts, the form letter provided a means for those who signed it to "resign from membership in CWA Local 1040[,]" reiterated that the employee understood that resignation would "have no effect on [his/her] employment[,]" stated that resignation required that "both the union and the company . . . immediately cease enforcing the dues check-off authorization[,]" and noted that "payment of union dues" was a requirement of membership. *Id.*

Approximately 90% of the employees (80 individuals) signed and returned the form letter to New Concepts, which, in turn, forwarded the letters to the Union. Though the Union regarded the form letter as not binding, it nonetheless suspended the collection of dues from all employees, whether or not they had signed the form letter.

The parties resumed bargaining in January 2017 and continued those efforts through much of that year. It "is undisputed" that, throughout this time, New Concepts "push[ed] for negotiations to move faster" and for bargaining sessions to take place more frequently. J.A. 41. Still, no final agreement was reached.

5

For its part, the Union attempted – unsuccessfully – to revive support among unit members. Union employee Donna Ingram led those efforts. She candidly acknowledged that members "were dissatisfied" with prior enforcement of the contract and with the "complete lack of communication" from those who had served previously as union representatives. R. 3187. And despite efforts by the Union to revive support after the decertification petition was withdrawn, Ingram conceded that the "reception by employees was not positive." R. 3188. For example, the "Union was turned away by employees on multiple occasions both at employee facilities and from the employees' individual residences." R. 3188-89. Ingram also attempted to gather new authorization forms throughout 2017. And although she claimed to have received a few dozen authorization cards in response to her efforts, she "acknowledged she was only speculating" as to that estimate and admitted "that some of those were likely duplicates." R. 3189. By August 2017, "only a handful of employees" remained who had "actually authorized dues to be deducted, with nearly every employee having already requested in writing" that their deductions cease. *Id*.

On August 15, 2017, Setteducati distributed to employees a memorandum (the "August Memo" and, together with the December Memo, the "Memos") instructing them on how they could resume or start paying dues. R. 1435. The August Memo began by reminding employees that New Concepts had, in 2016, received "numerous questions" from employees about dues deductions, and that since then, "over 95%" of New Concepts employees, including both "new" and "long term staff," had chosen not to pay dues. *Id.* The August Memo went on to explain the impetus behind its having been

6

sent: to rebut the Union's allegation that New Concepts, through the distribution of the December Memo, had "'coerced' employees into not paying Union Dues." *Id.* Setteducati wrote: "As you know, that's just not true. BUT, to prove that, [New Concepts is] attaching to this memo [an authorization form] that you can sign and return if you *want* to start paying Union Dues." *Id.* (emphasis in original). The August memo re-emphasized that the payment of dues was voluntary and that there would be "no reward *for* NOT paying Union Dues" nor "punishment for resuming or starting to pay" dues. *Id.* (emphasis in original). Despite the information and assurances provided to employees in the August Memo, New Concepts did not receive any completed cards authorizing the payment of union dues.

In September 2017, New Concepts announced its intention to poll employees as to their support for the Union. By letter, New Concepts informed the Union that it had a good faith doubt of the Union's majority status. Specifically, New Concepts pointed to: (1) unit employees' lack of participation at bargaining sessions; (2) the fact that nearly every employee had elected to stop paying dues; (3) the fact that no employees opted to resume dues deduction after New Concepts circulated the August Memo; and (4) the claim that roughly 50% of unit employees had backed Marshall's decertification petition. The poll was conducted on September 21 and mimicked the process used in an NLRB election. Voting was by secret ballot and included oversight by a retired judge. The Union declined an invitation to participate in any way or to even have an observer present. With approximately 85 employees remaining eligible to participate in the election, the Union lost the vote by 61 to 9. New Concepts then withdrew its recognition of the Union

based on what it described as the "overwhelming" results of the poll. R. 2531.

## II.    Procedural History

The NLRB's General Counsel filed a complaint against New Concepts alleging, in eight respects, that New Concepts violated Sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act (the "Act"). 29 U.S.C. § 158(a)(1), (5). The General Counsel alleged that: (1) Setteducati's October 2016 employee meetings unlawfully encouraged support for the decertification petition; (2) Setteducati unlawfully led employees to believe that the Union was an ineffective bargaining representative during the lead-up to the September 2017 poll; (3) New Concepts refused to provide the Union with requested financial information; (4) the December Memo unlawfully solicited employees to resign their union membership and withdraw authorization for dues deduction; (5) the August Memo was coercive and an unlawful poll of union sentiment; (6) New Concepts' conduct during the CBA negotiations amounted to bad faith bargaining; (7) the September 2017 poll of employees was inconsistent with the requirements for lawful polling of employees under *Struksnes Construction Co.*, 165 NLRB 1062 (1967); and (8) New Concepts, based on the results of the poll, unlawfully withdrew recognition from the Union.

The ALJ conducted a hearing in the fall of 2018 during which he heard testimony and made credibility determinations. He found all of New Concepts' witnesses to be credible. Specifically, he found Setteducati "to have been straightforward in answering questions without regard for any

particular agenda," and New Concepts' attorney to have testified "honestly" and with "candor" about the motivation behind New Concepts' bargaining positions. J.A. 42. The ALJ also found the Union's lead negotiator, Ingram, to be credible, and several Union lay witnesses to be mostly credible, but he found two of the Union's witnesses to be "less than credible." *Id.* The ALJ then dismissed all the allegations, concluding that "[n]otwithstanding that I have not found [New Concepts] to have violated the Act in any of the manner[s] alleged, the General Counsel's position ignores the fundamental truth underlying this case, that it was the Union's own absence over the span of multiple years that ultimately led to its loss of support." *Id.* at 45.

The General Counsel and the Union filed exceptions to the ALJ's decision. The Board upheld the ALJ's credibility determinations and affirmed the dismissals of the first three of the General Counsel's charges. However, a two-member majority of the Board reversed the ALJ's dismissal of the other five. The majority concluded that the December and August Memos were coercive and that New Concepts engaged in overall bad faith bargaining. As to the September 2017 poll, the Board decided that it was not grounded in a good faith doubt about the Union's majority status, that it failed to adhere to two required safeguards, and that it did not provide an adequate basis for the withdrawal of recognition from the Union. Board member Ring dissented from the reversal of those five dismissals.

This appeal followed.

9

### III. Jurisdiction and Standard of Review

The Board had jurisdiction over this matter pursuant to 29 U.S.C. § 160(a). We have jurisdiction to review the Board's order pursuant to 29 U.S.C. § 160(e) and (f).[1]

We are "highly deferential" in our review of orders of the Board. *Trimm Assocs., Inc. v. NLRB*, 351 F.3d 99, 102 (3d Cir. 2003). This Court "will uphold the Board's interpretation of the NLRA so long as it is rational and consistent with the Act." *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 201 (1991) (internal citation and quotation marks omitted). We "exercise plenary review over questions of law and the Board's application of legal precepts" and accept the Board's factual determinations if they are "supported by substantial evidence." *Spectacor Mgmt. Grp. v. NLRB*, 320 F.3d 385, 390 (3d Cir. 2003) (internal citation omitted). Substantial evidence requires "more than a scintilla[,]" which means such evidence that "a reasonable mind might accept as adequate to support a conclusion." *Adv. Disposal Servs. E., Inc. v. NLRB*, 820 F.3d 592, 606 (3d Cir. 2016) (internal citation omitted).

The Supreme Court has clarified that "a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). And "evidence supporting a conclusion may

---

[1] The Act does not impose a time limit for the filing of petitions for review.

10

be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's." *Id.* at 496. If the Board does not reject the examiner's credibility determinations, we "review the Board's decision in light of the [examiner's] undisturbed finding that [a witness] testified truthfully." *NLRB v. Alan Motor Lines, Inc.*, 937 F.2d 887, 892 (3d Cir. 1991).

## IV.    Forfeiture

The General Counsel argues that New Concepts has forfeited arguments under § 10(e) of the NLRA and the NLRB's corresponding regulation, 29 C.F.R. § 102.46. We disagree.

Section 10(e) of the NLRA states that "[n]o objection that has not been urged before the Board . . . shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e). Section 10(e) "is a jurisdictional administrative exhaustion requirement designed to ensure that any issue raised on appeal was first presented to the Board[.]" *Adv. Disposal Servs.*, 820 F.3d at 598 (internal citations omitted). *See also Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665-66 (1982). The provision serves a notice function which allows the Board to consider all material issues, thereby "insur[ing] against piecemeal appeals[.]" *NLRB v. Cardox Div. of Chemetron Corp.*, 699 F.2d 148, 152 n.10 (3d Cir. 1983).

The Board has promulgated regulations to flesh out § 10(e)'s requirements. *See* 29 C.F.R. § 102.46. A party may file with the Board "exceptions" to an ALJ's rulings, findings, conclusions, or recommendations. § 102.46(a). An opposing party may then file a brief in answer to those exceptions, § 102.46(b), and/or file cross-exceptions to the ALJ's decision, § 102.46(c). A matter which is "included in exceptions or cross-exceptions" is thereby preserved. § 102.46(f).

Here, the General Counsel filed detailed exceptions to the ALJ's decision. New Concepts, as the prevailing party, filed a letter with the Board urging it to uphold the ALJ's order and attaching the brief it had initially filed with the ALJ. On appeal, the General Counsel argues that New Concepts has forfeited numerous arguments because it did not adequately raise them before the Board.[2] New Concepts counters that its arguments are preserved.[3]

---

[2] *See, e.g.*, NLRB Br. 23-27. The General Counsel's main argument is that "New Concepts . . . attempts to distinguish or undercut *Space Needle*[, *LLC*, 362 NLRB 35 (2015)]," and the "back and forth between the Board majority and dissent regarding that case does not excuse New Concepts from its statutory obligation under § 10(e)." *Id.* at 24 (citing *Oldwick Materials, Inc. v. NLRB*, 732 F.2d 339, 343 n.1 (3d Cir. 1984) (cleaned up)). The General Counsel flags a range of other "arguments on appeal" which it claims are "new" but which we decline to exhaustively list here. *See, e.g.*, *id.* at 27, 37-38.

[3] *See* Reply Br. 10-12, 17-19, 22-24, 26. In essence, New Concepts argues that "the General Counsel seeks more detail than what Section 10(e) requires." Reply Br. 10. New Concepts

Section 10(e) does not preclude our review of the key issues in this case related to the alleged unfair labor practices. First, the General Counsel's reliance on *Oldwick* is misplaced; there, "petitioner *never* even filed an answer to the amended complaint." 732 F.2d at 342 (emphasis in original). Second, the Board was clearly on notice of the key issues in the case before us. For example, *Space Needle, LLC*, 362 NLRB 35 (2015), features prominently within the Board's own written opinions. The Board majority, rather than raise *Space Needle* as part of an entirely new argument, addressed *Space Needle* to respond to the ALJ's discussion of the standard for "employer communications regarding dues deduction and resignation of union membership." J.A. 7.[4] The General Counsel's own exceptions, as well as the ALJ's opinion, also referenced

asserts that some arguments were "essentially components of its argument to the Board." *Id.* (internal citation omitted). It also claims to have "incorporated the positions of the ALJ in its submission to the Board," *id.* at 12, and "where the ALJ did not explicitly reference each point . . . [New Concepts'] points are components underlying the ALJ's positions." *Id.* at 18 (internal citation omitted) (cleaned up). And it argues that many of the allegedly forfeited arguments are simply characterizations of material in the record. *Id.* at 22-24, 26.

[4] As discussed *infra*, we need not reach any argument, raised or not, concerning the validity of the Board's decision in *Space Needle* to ultimately decide this case. New Concepts made clear at oral argument that its "primary position" on appeal is that *Space Needle* is "totally distinguishable from [New Concepts'] situation," so we need not "reach . . . whether [*Space Needle*] was correctly decided." ECF No. 46 at 12-13.

13

"ministerial" assistance, the standard set forth in *Space Needle*. R. 3139, J.A. 42. New Concepts maintains that it "did not need to explicitly mention *Space Needle* . . . to make the central objection" regarding "the applicable and controlling" standard. Reply Br. 10-11. We agree.

As to New Concepts' other allegedly forfeited arguments, many are simply expansions upon portions of the record. For example, the NLRB claims that "New Concepts . . . belatedly challenges the Board's factual finding that no employees asked New Concepts for help resigning from [the Union]." NLRB Br. 26. But the ALJ's opinion explicitly addressed the existence of "employee questions[.]" J.A. 42. New Concepts, rather than challenging an undisputed finding of the Board, seeks on appeal to clarify the existence and nature of those questions. Any remaining arguments are ordinary rebuttals to the Board majority's reasoning.[5]

---

[5] Consider, for example, the General Counsel's argument that "New Concepts offered no defense of the August [M]emo to the Board, and thus cannot do so for the first time on appeal." NLRB Br. 28. This argument strains reason. The August Memo and its content are part of the basis for the General Counsel's unfair labor charge. And it was discussed by the ALJ, with whom New Concepts agreed, as well as by the Board itself. If we accepted the NLRB's reasoning, it would lead to a "hyper-refinement" of New Concepts' procedural obligations. *Cf. HTH Corp. v. NLRB*, 823 F.3d 668, 674 (D.C. Cir. 2016) (taken "to its extreme, such hyper-refinement of party obligations under § 10(e) would mean that any change made by the Board *sua sponte*, however trivial, would require a

The "crucial question in a section [10](e) analysis is whether the Board received adequate notice of the basis for the objection." *NLRB v. FedEx Freight, Inc.*, 832 F.3d 432, 437 (3d Cir. 2016) (internal citation and quotation marks omitted). Here, we are satisfied that this notice requirement has been met.

## V. Departure from Precedent

New Concepts argues that, in applying *Space Needle*, the Board departed from its own precedent in *Peoples Gas System, Inc.*, 275 NLRB 505 (1985). We do not agree.

The Board has construed the Act to require employers to walk a fine line when engaging with employees on matters concerning union representation. On the one hand, the Act protects employees' right to resign from a union, as well as employers' ability to "inform employees of their rights[.]" *Peoples Gas*, 275 NLRB at 508. On the other hand, employers must refrain from creating an "atmosphere . . . of coercion, intimidation, or union animus." *Id.* (internal citation omitted). An employer "may lawfully provide neutral information to employees regarding their right to withdraw their union support, provided that the employer offers no assistance, makes no attempt to monitor whether employees do so, and does not create an atmosphere wherein employees would tend to feel peril in refraining from withdrawing." *Space Needle*, 362 NLRB at 36 (cleaned up).

---

motion for reconsideration"). We decline to adopt such an overly expansive reading of § 10(e).

15

In *Peoples Gas*, the Board determined that an employer's dues checkoff memorandum did not violate the Act. 275 NLRB at 509. There, the CBA provided for an annual period during which employees could revoke their dues authorizations. *Id.* at 505. After several employees asked supervisors about revoking dues authorizations, the employer sent letters to all employees just before the dues revocation period began, informing them that they had a "short opportunity in the next few days" to discontinue the dues checkoff or to resign from their union. *Id.* at 506. Each letter included a dues checkoff form. The letter noted that the employer was not "urging [employees] either to remain [] member[s] of the Union or to resign from the Union, or to discontinue the dues checkoff." *Id.* Rather, any decision to leave would "not make any difference in . . . treatment by the Company." *Id.* The Board concluded that the language of the letter "assured employees that the decision to remain a member of the union or to resign" would "make no difference in their terms and conditions of employment." *Id.* at 508. The Board also found that the employer had both a contractual basis (the annual dues revocation period under the CBA) and an extracontractual basis (the employee questions about dues revocation) for sending the letter, and so concluded that the employer did not violate the Act. *Id.* The Board contrasted its decision with previous cases in which employers "had no contractual or other valid reason for" distributing dues revocation forms and had thus "acted unlawfully." *Id.* at 509.

The Board distinguished *Peoples Gas* in its *Space Needle* decision. In the latter case, the employer distributed to its employees a letter "advising employees of their options regarding the payment of dues, including the revocation of

16

dues authorizations and resignation from union membership." 362 NLRB at 35. The Board noted that, unlike in *Peoples Gas* and similar cases, the *Space Needle* employer "did not distribute its letters in anticipation of a contractually-established window period for revocation" and so lacked a contractual basis for providing employees with information about how to revoke dues authorizations or resign from the union. *Id.* at 37. The *Space Needle* employer also inserted itself into the dues revocation process such that it was able to monitor employee responses by "requiring the sample resignation letters to be requested directly from management." *Id.* And though the letter made clear that an employee's resignation from the union would not alter the terms of his employment, it provided no explicit assurances against repercussions for choosing "not to resign . . . union membership." *Id.* The Board therefore concluded that the employer violated § 8(a)(1) of the Act. *Id.*

New Concepts primarily argues that *Space Needle* "departed from Board precedent." New Concepts Br. 20.[6] Yet New Concepts hedges by arguing that, "regardless of its

---

[6] *See, e.g.*, New Concepts Br. 1 (characterizing the Board's application of *Space Needle* as a "depart[ure] from controlling precedent"); *see also id.* at 13 ("the Board departed without justification from its own precedent . . . thereby violating the APA"); *id.* at 15 (arguing, while addressing this Court's standard of review, that we have "routinely declined to enforce Board findings that deviate from precedent or apply an incorrect legal standard without a reasoned explanation"); *id.* at 20 ("the Board deviated from precedent . . . [and] *Space Needle* itself departed from Board precedent").

17

validity, *Space Needle* is not on point[.]" *Id.* at 21.[7] The Board members themselves spill a great deal of ink debating the appropriate standard for employer conduct when interacting with employees on matters affecting their union representation.[8] We believe it unnecessary to wade into that debate. It is "the primary responsibility of the Board and not of the courts to strike the proper balance between" employers and employees. *Vesuvius Crucible Co. v. NLRB*, 668 F.2d 162, 166 (3d Cir. 1981) (internal quotation marks and citation omitted). Nor need we do so in deciding this case.

Regardless of the nature of New Concepts' arguments concerning Board precedent, it is enough that we simply conclude that *Space Needle* is distinguishable on its facts from *Peoples Gas*.[9] The employer in *Peoples Gas* had both a

---

[7] New Concepts also reframes its argument: "the Board … declined to follow or repudiate a prior holding . . . [and] by failing to properly apply either [*Peoples Gas* or *Space Needle*], the Board has created contradictory case law." New Concepts Br. 22 (internal citation omitted) (cleaned up).

[8] *See, e.g.*, J.A. 27 (Dissenting member Ring concluded that "the majority relies on *Space Needle*, [and] *Space Needle* . . . depart[ed] from precedent without providing a reasoned explanation. . . . [*Peoples Gas*] correctly honor[s] employers' . . . rights[, whereas] *Space Needle* . . . does not.").

[9] New Concepts concedes that the "Board in *Space Needle* specifically distinguished *Space Needle* from *Peoples Gas*." New Concepts Br. 21. Its argument that the Board "shift[ed] its precedent without announcing a change[,]" *id.* at 22, is not consistent with this concession. Further, and as to New Concepts specifically, the Board majority addressed whether

18

contractual and extracontractual basis for sending letters to employees. 275 NLRB at 508-09. And its letter contained adequate assurances that employees could "decide for [themselves] without pressure from . . . the company[.]" *Id.* at 508. By contrast, the employer in *Space Needle* lacked a contractual basis for the distribution of its letter, monitored employee responses, and provided no explicit assurances against repercussions for choosing to remain part of the union. 362 NLRB at 37. Further, to the extent that *Space Needle* narrowed the permissible range of employer conduct to "ministerial or passive aid[,]" 362 NLRB at 36 (internal citation omitted), that rule is "rational and consistent with the Act" and so is entitled to deference. *Litton*, 501 U.S. at 201.

We conclude, then, that the Board majority's application of *Space Needle* did not represent a departure from its own precedent.

## VI. Substantial Evidence Analysis

The Board majority determined that New Concepts engaged in unfair labor practices when it solicited employees to resign from the Union, bargained in bad faith, polled employees' Union support, and, ultimately, withdrew

---

"the Board's decision[] in . . . *Peoples Gas* [is] inconsistent with the standard applied in *Space Needle*." J.A. 9, 10-11. Though New Concepts objects to the Board majority's application of *Space Needle*, any argument that the Board majority failed to explain its reasoning is unsupported by the record.

19

recognition from the Union. We conclude that the majority's determinations are not supported by substantial evidence.

### A. The December Memo

The Board majority decided that the December Memo violated the Act. In reaching that conclusion, it determined that New Concepts lacked a contractual basis for sending the Memo because neither the Union's own communications nor the most recent CBA imposed a December 30 deadline for revoking dues authorization. The majority also determined that New Concepts lacked an extracontractual basis for sending the Memo. In the majority's view, New Concepts tracked the identities of employees who chose to resign, and its Memo failed to provide adequate assurances against reprisals.

These determinations lack support in the record. As to a December 30 deadline, although employees who signed New Concepts' authorization form "might have been able to revoke their authorizations at any time," many of the unit members "were still bound to the Union's dues-deduction card." J.A. 27, n.19. The card permitted revocation of dues-checkoff authorizations only twice a year after December 31. *Id.* Further, the December Memo simply stated that "the Union *may* take the position that you can only revoke your Union Dues payroll deduction authorizations twice a year," and that "[employees] *may* be forced to pay Union Dues for another 6 months." R. 1434 (emphases added). In advising of that possibility, New Concepts correctly sounded a note of caution. For at least some employees, a deadline did appear to exist. And even if it did not, the use of "may" is hardly a declaration that a deadline actually loomed. In short, New Concepts had a

contractual basis for distributing the December Memo. And because the record shows that New Concepts received employee questions concerning the deduction of dues and the possibility of resignation, it had an extracontractual basis for distribution of the Memo.

With respect to tracking employee responses, the Board majority took issue with New Concepts' role as the intermediary charged with submitting completed dues forms to the Union. As such, their opinion declared that New Concepts knew "exactly which employees chose to resign their union membership and thereby further pressured employees to make that choice." J.A. 8. We agree with the ALJ that there was "no evidence" to support the assertion that New Concepts "maintained a list of those who had withdrawn and those who had not for purposes beyond payroll administration." *Id.* at 43. True, Setteducati had access to the completed resignation letters and the total number of employees withdrawing. But he used that data merely to inform the Union of employees' choices to cease paying dues and to acknowledge New Concepts' legal obligation to stop deducting them. And unlike in *Space Needle*, New Concepts did not require "resignation letters to be requested directly from management," did not track which employees requested letters, and did not instruct management to convey its antipathy to union-dues collection. 362 NLRB at 37. Simply performing administrative acts of distribution, collection, and forwarding to the Union of completed forms does not equate to tracking.[10]

---

[10] Tracking requires "monitor[ing,]" which is more intentional and active than was the case here. *See R.L. White Co., Inc.*, 262

The December Memo makes clear that payment of dues remained voluntary and that there would be "no reward for stopping Union Dues or punishment for continuing to pay Union Dues." R. 1434. And the Memo stated explicitly that resignation from the Union had "no effect on . . . employment." R. 1432. The Board majority acknowledged as much but concluded that the Memo "contained no assurance[s]" with respect to "resign[ation] from the Union." J.A. 8. This argument is no more than hair-splitting. The December Memo made clear that "payment of union dues" was a requirement of membership. R. 1432. And, when pressed at oral argument, Board Counsel acknowledged that an employee could not remain a member of the Union without paying dues. ECF No. 46 at 33-34. It should be obvious, then, that an employee could reasonably infer that by stopping the authorization of dues deduction she thereby intended to withdraw her union membership. Accordingly, the Memo contained adequate assurances against reprisal.[11]

---

NLRB 575, 576 (1982) ("An employer [may not] attempt to ascertain whether employees will avail themselves" of "their right to revoke [dues authorizations]," such as by "monitor[ing] whether employees would actually revoke their authorization cards.").

[11] The December Memo assured employees that there would be "no reward for stopping Union Dues or punishment for continuing to pay Union Dues." R. 1434. This differs from the letter in *Space Needle*, which did not contain specific assurances for employees who elected to continue to pay dues. 362 NLRB at 36-37.

Finally, the Board majority's insistence that New Concepts solicited responses to the December Memo is unsupported by the record. In dismissing the charge related to the December Memo, the ALJ pointed out that "although the [General Counsel] alleged two supervisory employees . . . had solicited employees to sign withdrawal forms, neither of these individuals was called to testify" and no "evidence [was] elicited to [show the] alleged solicitation[.]" J.A. 43. The record supports the ALJ's observation.

New Concepts' distribution of the December Memo did not violate the Act, and the Board majority's conclusion to the contrary was not supported by substantial evidence.

## B. The August Memo

The Board majority determined that the August Memo also violated the Act. In support, it repeated the conclusions it advanced about the December Memo with respect to alleged tracking and inadequate assurances against reprisals. And it concluded that New Concepts lacked "any dues-based justification" for distribution of the August Memo. J.A. 12. None of these determinations find support in the record.

As was the case with the December Memo, there was no evidence of tracking. Not a single employee returned a completed card authorizing the payment of union dues. New Concepts' mere awareness of that fact, due to its administrative role in deducting dues payments, is hardly sufficient to make out a case for tracking. With respect to reprisals, the August Memo was just as clear as the December Memo had been: dues payments were voluntary, "[t]here [was] no reward *for* NOT

23

paying Union Dues," and there "[was] no punishment for resuming or starting to pay Union Dues." R. 1435 (cleaned up). And New Concepts did assert a dues-based justification for distributing the August Memo. The August Memo went on to explain that it was intended to rebut *the Union's accusations* of coercion by providing employees with information on how "to start paying Union Dues." *Id.*

The Board majority's determinations with respect to the August Memo are thus not supported by substantial evidence.

### C. Bargaining Conduct

Section 8(a)(5) of the Act prohibits an employer from "refus[ing] to bargain collectively with the representatives of [its] employees[.]" 29 U.S.C. § 158(a)(5). This is "not simply" a duty to participate in negotiations, but rather "impose[s] a mutual duty upon the parties to confer in good faith with a desire to reach agreement[.]" *NLRB v. Ins. Agents' Int'l Union*, 361 U.S. 477, 485, 488 (1960) (internal citations omitted). As "Congress specifically delegated to the Board the primary responsibility of defining the scope of the duty to bargain," we will adopt the Board's construction of the duty to bargain in good faith so long as it is consistent with the Act. *Latrobe Steel Co. v. NLRB*, 630 F.2d 171, 176 (3d Cir. 1980) (internal citation omitted).

The Board has long held that, "in some cases, the content of specific proposals" is relevant to determining whether the proposal was made in good faith. *Altura Commc'n Sols., LLC*, 369 NLRB No. 85, 1 (2020). As relevant here, the Board may consider "regressive bargaining" tactics in

"determining whether there has been bad-faith bargaining," especially where "the proponent of a regressive proposal fails to provide an explanation for it, or the [explanation] appears dubious[.]" *In re Hardesty Co., Inc.*, 336 NLRB 258, 260 (2001). The Board has found a party to have engaged in regressive bargaining where the party has offered a proposal that cuts back on existing terms of employment or retracts a term or terms of the party's prior proposal. *Id.* The Board has also found regressive bargaining to have occurred where a party offers a proposal that it "could not reasonably have expected the Union to agree to." *U.S. Ecology Corp.*, 331 NLRB 223, 224 (2000).

As the Board has previously recognized, "[r]egressive bargaining . . . is not unlawful in itself; rather, it is unlawful if it is for the purpose of frustrating the possibility of agreement." *Id.* at 225. The Board has long construed the duty to bargain in good faith to include "conduct[] both at and away from the bargaining table." *Pub. Serv. Co. of Okla.*, 334 NLRB 487, 487 (2001) (internal citation omitted). The Board has found violations of that duty where a party's "conduct away from the bargaining table confirms that it was focused more intently on eliminating its bargaining obligation . . . than on successfully negotiating a collective-bargaining agreement." *Id.* at 489.

Here, the Board majority concluded that New Concepts' "proposals on three issues — a wage freeze, elimination of dues checkoff and union security, and elimination of arbitration — were regressive and offered for the purpose of frustrating agreement." J.A. 13. The ALJ had concluded otherwise, characterizing these proposals as "no more than hard bargaining on the part of an employer who knew it had

the upper hand at the bargaining table." *Id.* at 44. We agree with the ALJ.

As a starting point, both parties reserved the right to modify their proposals over the course of their bargaining.[12] With respect to wages, New Concepts' prioritization of merit pay and later wage reopener proposals reflected the reality of rising costs in the midst of stagnant state funding. And New Concepts obviously knew it had the upper hand after the decertification petition was filed. It is true that, in its first bargaining proposal, New Concepts proposed a merit pay system, but later proposed a wage freeze with a possible reopener upon receiving additional funding from the state. Yet the Board majority's conclusion — that this "unexplained decision to withdraw its merit pay proposal is especially glaring," J.A. 13 — blinks reality. As the ALJ noted, "[t]he wage freeze and reopener proposal . . . came after [the] initial proposal for merit pay was dismissed out-of-hand by the Union." *Id.* at 44. This was no more than the ordinary give and take of nearly all bilateral negotiations.

---

[12] The Union reserved "the right to present new contract proposals, or modify and/or delete proposals that ha[d] been presented, no later than the third meeting between the parties." R. 585, 1819, 2810. New Concepts reserved "the right to add to, delete, withdraw or modify any proposals during the course of contract negotiations on a new labor agreement." R. 1822. Neither the Union nor New Concepts "objected to the other's reservation of th[e] right" to modify proposals during the bargaining process. J.A. 33.

With respect to dues checkoff and union shop, it is true that New Concepts proposed to remove both from the contract. But as the ALJ observed, these proposals, "while clearly anathema to the Union, were within [New Concepts'] rights to make, and were accompanied by an explanation as to why [New Concepts] was resistant to those provisions." *Id.* As the ALJ further noted, "the fact that [New Concepts] proposed agreeing to union shop if the Union agreed to a poll of its members, rather than being evidence of bad faith, was evidence of the genuine nature of its explanation as to why it was so resistant to a union shop." *Id.* Quite simply, the record here is replete with evidence of employee dissatisfaction with the Union. The Board majority conceded that "[a]n employer's philosophical opposition . . . does not, by itself, constitute bad-faith bargaining." *Id.* at 14 (citation omitted). And, as the dissenting Board member reasoned, when viewed in the context of the bargaining environment — over 90% of the bargaining unit had just resigned — these proposals could have easily reflected "employees' wishes." *Id.* at 35.

With respect to arbitration, it is true that New Concepts proposed to remove or alter the arbitration provision from the contract. Witnesses for New Concepts testified that "cost concerns motivated . . . opposition to arbitration," a contention that may seem counterintuitive to those familiar with transaction costs inherent in traditional litigation. And it is also true that the parties "had never arbitrated a dispute, so there [was] no history of expensive arbitrations . . . [a]nd it is generally understood that arbitration is less expensive than litigation." J.A. 15. We agree with the ALJ that arbitration "is among the most powerful tools in a collective bargaining agreement, when it is negotiated." *Id.* at 44. But we also agree

27

that "an employer is not required . . . to accept any particular contract term, and it is not clear from the evidence that the parties had reached a firm agreement on an arbitration clause earlier in bargaining." *Id.*

Finally, the Board majority determined that New Concepts' conduct away from the bargaining table focused on elimination of its bargaining duty rather than on negotiation. It relied on the fact that, after two months of bargaining, New Concepts suspended bargaining "1 day after the decertification petition was filed[.]" J.A. 15. The majority also relied, in large part, on the alleged unlawfulness of the December and August Memos to further demonstrate bad faith away from the bargaining table. But the suspension of bargaining after the decertification petition could reasonably be interpreted to reflect a desire to suspend negotiations while the Union's future was in doubt. And, as we have concluded *supra*, the December and August Memos were lawful.

The Board majority's determination with respect to bargaining is not supported by substantial evidence.

## D. Poll and Withdrawal

As the ALJ acknowledged, "[a]bsent unusual circumstances, the polling of employees by an employer will be violative of . . . the Act" because it is an attempt "to ascertain employee views and sympathies regarding unionism," which "tends to cause fear of reprisal[.]" J.A. 44 (citing *Struksnes Constr. Co.*, 165 NLRB 1062, 1063 (1967)). But, if an employer has "a reasonable doubt about a union's continued majority status," it may "test the accuracy of that doubt" by

"poll[ing] its employees about their union sentiments." *Texas Petrochemicals Corp.*, 296 NLRB 1057, 1061 (1989). A poll is lawful only if (1) the poll's purpose is to assess a "union's claim of majority, (2) this purpose is communicated to the employees, (3) assurances against reprisal are given, (4) the employees are polled by secret ballot, and (5) the employer has not engaged in unfair labor practices or otherwise created a coercive atmosphere." *Struksnes*, 165 NLRB at 1063. All five safeguards must be met. *See Grenada Stamping & Assembly*, 351 NLRB 1152, 1152 n.4 (2007).

The Board majority concluded that the September 2017 poll of employees was inconsistent with the requirements under *Struksnes* and that New Concepts thus unlawfully withdrew recognition from the Union. In support, it determined that New Concepts lacked a good faith doubt as to the Union's majority status, and that New Concepts violated *Struksnes* safeguards three (assurances against reprisals) and five (other unfair labor practices or coercive atmosphere).

While we fully recognize that the polling of employees is disfavored, we agree with the ALJ that "this is the unusual case where [New Concepts] was lawfully able to poll its employees." J.A. 45. New Concepts had a good faith doubt about the Union's majority status. A decertification petition had been filed, few unit members attended bargaining sessions, over 90% of the unit had withdrawn authorization for dues checkoffs over eight months earlier, and not a single employee requested dues to be deducted in response to New Concepts' offer to do so. Although we agree that "[n]one of these items would support an employer's withdrawal of recognition, individually or even taken together[,]" they do "support a

29

good-faith doubt on the part of [New Concepts] sufficient to allow it to conduct a lawful poll." *Id.* We are satisfied that New Concepts adhered to the *Struksnes* safeguards. It "informed employees that they were not required to vote and that it would honor their wishes[.]" *Id.* at 18. It conducted the vote in secret. *Id.* at 37. And it attempted to follow the Board's "gold-standard procedure for a valid election," *id.* at 45, including having "ballots . . . counted by a neutral third party, a retired judge[,]" *Id.* at 37. Because the poll was not unlawful, neither was New Concepts' subsequent withdrawal of recognition from the Union.

## VII. Conclusion

While it is a common human trait to want to *get* something for nothing, almost no one wants to *pay* something and receive nothing in return. As the ALJ concluded, the "General Counsel's position ignores the fundamental truth underlying this case, that it was the Union's own absence over the span of multiple years that ultimately led to its loss of support." J.A. 45. For the reasons set forth above, we conclude that the Board majority's determinations regarding the alleged unfair labor practices are not supported by substantial evidence. We will therefore grant New Concepts' petition for review and deny the NLRB's cross-application for enforcement.

**KRAUSE**, *Circuit Judge*, concurring.

I join Judge Smith's excellent majority opinion without reservation. I write separately, however, to call attention to an argument that continues to be invoked by the National Labor Relations Board ("NLRB" or the "Board") and that exposes a troubling gap between Section 10(e) of the National Labor Relations Act ("NLRA"), and the Board's regulation at 29 C.F.R. § 102.46 that purports to interpret it.

In the former, Congress excluded from judicial consideration any "objection" to the ALJ's decision that was not "urged before the Board" absent extraordinary circumstances, 29 U.S.C. § 160(e), and the Supreme Court historically interpreted this issue-exhaustion requirement to be jurisdictional, *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665-66 (1982). In the latter, however, the Board purported to extend this bar to "[a]ny exception" a party might seek to raise to any "ruling, finding, conclusion, or recommendation" that was not "specifically urged" before the Board. 29 C.F.R. § 102.46(a)(1)(ii). It also prescribed a perplexing array of technical prerequisites to raising an "exception" before the Board in the first place, *id.* § 102.46(a)-(e), and, in addition, decreed that "matters" not raised in conformity with those requirements "may not thereafter be urged before the Board, or in any further proceeding," *id.* § 102.46(f). In short, by the terms of the regulation and as asserted by the Board in this case, if an issue was not raised before the Board in conformity with this exacting administrative exhaustion scheme, it falls outside this Court's subject matter jurisdiction.

1

The consequence of this expansive interpretation of Section 10(e) is that the Board's General Counsel, when confronting an arguably meritorious argument on appeal, has an ace in the deck, which he pulled here: While nominally citing the statute, the General Counsel in fact relies on cases applying the regulation to argue that—notwithstanding that an issue was fairly raised before the Board, and even if the Board actually addressed it—the issue is not "properly before the Court" if the General Counsel now says that it was raised without sufficient compliance with the regulation. Answering Br. 23.

That is a dubious proposition for two reasons. First, the regulation appears neither a reasonable nor an administrable interpretation of the statute, and, to the extent it purports to restrict (or the General Counsel argues it restricts) judicial review beyond the bounds of the statute, it would be *ultra vires*. Second, it is not clear that the exhaustion requirement is, in fact, jurisdictional. In *Santos-Zacaria v. Garland*, 143 S. Ct. 1103, 1111-14 (2023), the Supreme Court demarcated the line between jurisdictional requirements and claim-processing rules in a way that casts doubt on the continued vitality of *Woelke* and suggests that the exhaustion requirement may be nonjurisdictional. I address each of these issues below.

## I.     The Regulation Is Not Entitled to Deference

The prerequisites to judicial review imposed by the regulation are far more numerous and expansive than the statute, raising the question whether the regulation is entitled

to *Chevron* deference[1] or instead "crosses the line from permissible statutory interpretation . . . to *ultra vires* regulation contrary to the clear intent of Congress." *Shalom Pentecostal Church v. Acting Sec'y, Dep't of Homeland Sec.*, 783 F.3d 156, 158 (3d Cir. 2015); Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2). Below, I briefly review the relationship between the statute and the regulation, describe the confusion the regulation has generated, and explain why the regulation appears *ultra vires* and should be reconsidered by the Board.

### A. The Conflict Between Section 10(e) and the Board's Regulation

The NLRA authorizes the Board to "make, amend, and rescind . . . such rules and regulations as may be necessary to carry out the provisions" of the Act. 29 U.S.C. § 156. As relevant here, one of those provisions, Section 10(e), governs the Board's petitions to the Courts of Appeals, 29 U.S.C. § 160(e), and—like Section 10(f), which governs petitions by "any person aggrieved by a final order of the Board," 29 U.S.C.

---

[1] *See Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). Of course, *Chevron* deference itself may not survive this year's Supreme Court term, pending the Court's resolution of *Loper Bright Enters. v. Raimondo*, No. 22-451 (argued Jan. 17, 2024), *and Relentless, Inc. v. Dep't of Com.*, No. 22-1219 (argued Jan. 17, 2024). But regardless of whether or how much deference will henceforth be owed to administrative agencies generally, it would not change the calculus for the Board's regulation here because, for the reasons explained below, that regulation should not be accorded *Chevron* deference in any event.

3

§160(f)—vests jurisdiction in the courts to entertain those appeals, precludes the courts' consideration of "objection[s] [] not . . . urged before the Board," and specifies the standard for upholding the Board's findings and for re-opening of the record.[2] The Supreme Court has deemed that limitation on judicial review of objections to be jurisdictional, *Woelke*, 456 U.S. at 665-66, and has called it an administrative "issue-exhaustion requirement," *Sims v. Apfel*, 530 U.S. 103, 107-08 (2000). By the statute's terms, it provides: "No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. 160(e).

To "carry out" the purpose of Section 10(e)'s exhaustion requirement—that is, ensuring that parties "first give the Board an opportunity to rule upon all material issues in a case," *NLRB v. Cardox Div. of Chemetron Corp.*, 699 F.2d 148, 152 n.10 (3d Cir. 1983)—the Board promulgated 29 C.F.R. § 102.46. Relative to the statutory requirement, the exhaustion scheme set out in that regulation is long and elaborate. It "deem[s] to have been waived" "[a]ny exception to a ruling, finding, conclusion, or recommendation which is *not specifically urged*" before the Board. 29 C.F.R. § 102.46(a)(1)(ii) (emphasis added). It does not define the term "exception," but it does set out a host of detailed requirements with which a party must comply to plead an "exception." *Id.* § 102.46(a)(1)(i). For example, each exception must "(A) Specify the questions of procedure, fact, law, or policy to which exception is taken; (B) Identify that part of the [ALJ's]

---

[2] The full text of Sections 10(e) and 10(f) are reproduced as Attachment A to this opinion.

4

decision to which exception is taken; (C) Provide precise citations of the portions of the record relied on; and (D) Concisely state the grounds for the exception . . . ." *Id.* § 102.46(a)(1)(i)(A)-(D). Argument and supporting authorities may be submitted either in the "exceptions document" or in a supporting brief subject to its own technical requirements, *id.* § 102.46(a)(1)(i)(D), (a)(2), and any exception that fails to conform with these strictures "may be disregarded," by the Board, *id.* § 102.46(a)(1)(ii).

In response to exceptions, the adverse party—presumably the prevailing party before the ALJ—"may file" an answering brief or file "cross-exceptions" of its own that conform with the precise requirements of the regulation. *Id.* § 102.46(b)-(c). But though phrased in permissive terms, a party that fails to file an answering brief or cross-exceptions, or, upon an adverse ruling, to file for reconsideration so that it can raise its own exceptions before the Board, may have lost its day in court: Should the General Counsel press the point on appeal, the regulation provides that "[m]atters not included in exceptions or cross-exceptions may not thereafter be urged before the Board, *or in any further proceeding*."[3] *Id.* § 102.46(f) (emphasis added).

By its terms, then, the Board's regulation imposes different, more cumbersome, and less straightforward requirements on a litigant to preserve its opportunity for judicial review. While the statute requires merely that a party "urge[]" an "objection" before the Board, 29 U.S.C. § 160(e),

---

[3] The labyrinthine nature of 29 C.F.R. § 102.46 is apparent in the full version of the regulation, which is appended to this opinion as Attachment B.

5

the regulation demands that a party "*specifically* urge[]" an "exception" to each and every "ruling, finding, conclusion, or recommendation," 29 C.F.R. § 102.46(a)(1)(ii) (emphasis added), that the exception conform to precise specifications lest it be "disregarded," *id.*, and that regardless of whether the Board was in fact on notice of a "matter[]" and even addressed it in its opinion, a party who fails to include that matter in exceptions or cross-exceptions cannot raise it in court, *id.* § 102.46(f). In practice, this conflict creates uncertainty about parties' pleading obligations, enables arbitrary enforcement by the Board, and spawns confusion in the Courts.

## B. The Practical Consequences of The Board's Regulation

Confronted with a regulation that is inconsistent in many respects with the statute it purports to interpret, the courts and litigants have struggled to understand what suffices to satisfy issue-exhaustion under Section 10(e) and whether the administrative exhaustion scheme, purporting to implement what under *Woelke* is a jurisdictional statutory requirement, itself defines the courts' jurisdiction. The conclusions have been conflicting and confounding.

For starters, the courts diverge on whether fair notice to the Board or compliance with the regulatory specifications is the *sine qua non* of issue exhaustion under Section 10(e). Some have focused on the notice function,[4] considering an

---

[4] *See, e.g.*, *NLRB v. FedEx Freight, Inc.*, 832 F.3d 432, 437 (3d Cir. 2016) ("The crucial question in a section 160(e) analysis is whether the Board 'received adequate notice of the basis for the objection.'" (quoting *FedEx Freight, Inc. v. NLRB*,

---

6

issue exhausted, for example, even where the *opposing* party raised it in its exceptions before the Board.[5] But others have held that, even where fairly presented to the Board and/or actually addressed in its opinion, the issue was not exhausted unless the party seeking to raise the issue on appeal *itself* raised the issue before the Board.[6]

---

816 F.3d 515, 521 (8th Cir. 2016))); *Cast N. Am. (Trucking) Ltd. v. NLRB*, 207 F.3d 994, 1000 (7th Cir. 2000) ("Accordingly, to effectively preserve an issue**,** the respondent's exception must apprise the Board of the issue that the responding party intends to press on review sufficiently enough that the Board may consider the exception on the merits." (quoting *NLRB v. Howard Immel, Inc.*, 102 F.3d 948, 951 (7th Cir. 1996))); *T-Mobile USA, Inc. v. NLRB*, 90 F.4th 564, 579 (D.C. Cir. 2024) ("The 'critical question' in applying Section 10(e) is [] 'whether the Board received adequate notice of the basis for the objection.'" (quoting *Camelot Terrace, Inc. v. NLRB*, 824 F.3d 1085, 1090 (D.C. Cir. 2016))).

[5] *E.g.*, *NLRB v. U.S. Postal Serv.*, 833 F.2d 1195, 1201-03 (6th Cir. 1987), *decision supplemented*, 837 F.2d 476 (6th Cir. 1988).

[6] *See, e.g.*, *Oldwick Materials, Inc. v. NLRB*, 732 F.2d 339, 343 n.1 (3d Cir. 1984) (holding that even where one member of the Board dissented on a given ground and the majority responded, that "d[id] not excuse petitioner from its statutory obligation under § 10(e) to file exceptions presenting and preserving its argument to the Board"); *HTH Corp. v. NLRB*, 823 F.3d 668, 673 (D.C. Cir. 2016) ("[A] party may not rely on arguments raised in a dissent or on a discussion of the

Other points of contention resulting from the regulation's imprecision include whether a party who *prevailed* before the ALJ must still file "exceptions" to preserve an issue for appeal;[7] the specificity of pleading required to satisfy

relevant issues by the majority to overcome the § 10(e) bar; the Act requires the party to raise its challenges itself.").

[7] *Compare Barton Brands, Ltd. v. NLRB*, 529 F.2d 793, 801 (7th Cir. 1976) ("Failure to file exceptions to the [ALJ's] findings sometimes is excused where those findings were favorable to the petitioner, where subsequently reversed by the Board, and petitioner had no reason to file exceptions to a decision in its favor." (citation omitted)), *NLRB v. Good Foods Mfg. & Processing Corp., Chi. Lamb Packers, Inc.*, 492 F.2d 1302, 1305 (7th Cir. 1974) (same), *and NLRB v. Loc. 282*, 412 F.2d 334, 337 n.2 (2d Cir. 1969) (same), *with NLRB v. Cast-A-Stone Prods. Co.*, 479 F.2d 396, 398 (4th Cir. 1973) (holding that employer who prevailed before ALJ on issue was required to respond to NLRB counsel's exception to that issue to preserve it for appeal and noting that cases cited by employer that held the opposite "all arose before the Board's regulations permitted the filing of cross-exceptions by a prevailing party" or "relie[d] on authorities superseded by a change in the Board's regulation without adverting to either the basis for the earlier decisions or the change in the Board's rules"), *and Laborers' Int'l Union of N. Am., Loc. Union No. 91 v. NLRB*, 825 F. App'x 51, 53 (2d Cir. 2020) (holding that Section 10(e)'s jurisdictional bar applies "whenever a party fails to raise an objection before the Board, regardless of whether the ALJ had earlier made favorable findings on [a] point").

8

Section 10(e);[8] the sources of "notice" to the Board that courts

[8] *Compare, e.g.*, *E. Brunswick Eur. Wax Ctr., LLC v. NLRB*, 23 F.4th 238, 252 (3d Cir. 2022) (concluding that although party's "submissions to the Board . . . did not explicitly refer to the concepts of substantial compliance, disproportionate forfeiture, or punitiveness" that it sought to raise on appeal, those arguments were "essentially components of its argument to the Board"*)*, *FedEx Freight*, 832 F.3d at 438 (holding a mere footnote in filing before the Board sufficient to exhaust issue where notice to Board was evident in discussion of the issue in a Board member's concurrence), *and NLRB v. Sw. Sec. Equip. Corp.*, 736 F.2d 1332, 1335-37 (9th Cir. 1984) (holding party's efforts to give the Board notice "adequate, if somewhat inartful" and reminding Board that its regulatory scheme "command[s] it to read its procedural rules liberally" (citing 29 C.F.R. § 102.121)), *with Atl. City Elec. Co. v. NLRB*, 5 F.4th 298, 306 (3d Cir. 2021) (concluding exhaustion not satisfied where petitioner explicitly mentioned the "in conflict" principle in its submission to the Board but did so along with other standards of review as part of a broader objection), *NLRB v. FES*, 301 F.3d 83, 88-89 (3d Cir. 2002) (holding issue not exhausted where the "tenor" of petitioner's objection to the Board was "purely factual," but the tenor of the objection on appeal was legal): *Nova Se. Univ. v. NLRB*, 807 F.3d 308, 314 (D.C. Cir. 2015) (court lacked jurisdiction to hear objection to ALJ's decision where petitioner failed "to provid[e] the detail required by the Board's rules"); *Spectrum Health—Kent Cmty. Campus v. NLRB*, 647 F.3d 341, 348-49 (D.C. Cir. 2011) (holding that filing exception to the ALJ's imposed remedy "in its entirety" was insufficient to preserve specific challenge to ALJ's imposition of an affirmative bargaining order and stating that "to preserve objections for

may consider in assessing exhaustion;[9] and whether failure to comply with the regulation should be excused when the policies behind Section 10(e) are not implicated.[10] The extent

appeal a party must raise then in the time and manner that the Board's regulations require"), *and NLRB v. Daniel Constr. Co.*, 731 F.2d 191, 198 (4th Cir. 1984) (respondent's exception to "each and every part of the remedy recommended by the administrative law judge" insufficient to preserve objection to the calculation of Board's back pay award).

[9] *Compare* 29 C.F.R. § 102.46(b)(2) (providing that the answering brief to exceptions "must be limited to the questions raised in the exceptions," "must present clearly the points of fact and law relied on in support of the position taken on each question," and "must specify those pages of the record which the party contends support the Judge's finding"), *with, e.g.*, *E. Brunswick Eur. Wax Ctr.*, 23 F.4th at 250-52 (allowing parties to file letters and exhibits—rather than "true" answering briefs or cross-exceptions—and construing parties' arguments generously to encompass issues that were otherwise not explicitly argued before the Board), *and U.S. Postal Serv.*, 833 F.2d at 1202 (rejecting argument that issue not exhausted where, although respondents failed to raise it in cross-exceptions, they re-filed with the Board their briefs to the ALJ, which discussed the issue).

[10] *See, e.g.*, *Indep. Elec. Contractors of Hous., Inc. v. NLRB*, 720 F.3d 543, 551 (5th Cir. 2013) (noting that procedural requirements "can be measured in context," and following other courts who have held that "'when the policies underlying [Section 10(e)] are not implicated,' issues not directly raised to the Board may be considered on appeal"

10

of this confusion raises serious questions about whether the regulation is a lawful interpretation of the statute under *Chevron* or is arbitrary or capricious under the APA, 5 U.S.C. 706(2)(A).

The most profound confusion spawned by the regulation, however, concerns the extent to which it defines the courts' subject matter jurisdiction. Because the Supreme Court has held Section 10(e)'s issue-exhaustion requirement to be jurisdictional and the regulation purports to expound on that requirement, a number of courts have opined that regulatory noncompliance itself strips the court of jurisdiction.[11] This has

---

(citation omitted)); *IBEW v. NLRB*, 973 F.3d 451, 461 (5th Cir. 2020) (same); *Facet Enters., Inc.*, 907 F.2d 963, 970-72 (10th Cir. 1990) (collecting cases where courts considered issues not previously raised to the Board because Section 10(e)'s underlying policies were not implicated).

[11] *See, e.g.*, *Oldwick Materials*, 732 F.2d at 343 & nn.1-2 (holding failure to file exceptions under 29 C.F.R. § 102.46 commensurate with the "statutory obligation" to raise objections before the Board under Section 10(e)); *Laborers' Int'l Union*, 825 F. App'x at 52-53 (stating that Section 10(e) and § 102.46's requirements are jurisdictional); *NLRB v. Carpenters Loc. 209*, No. 91-70761, 1993 WL 268447, at *2 (9th Cir. July 15, 1993) (concluding court lacked jurisdiction to hear claim where Union failed to follow § 102.46's procedural requirements); *Nova Se. Univ.*, 807 F.3d at 313 (holding court lacked jurisdiction to hear objection to ALJ's decision where petitioner failed to "provid[e] the detail required by the Board's rules"); *see also NLRB v. Alwin Mfg. Co. Inc.*, 78 F.3d 1159, 1162 (7th Cir. 1996) (citing § 102.46

serious consequences for petitioners who may unwittingly lose their right to Article III review, and it is all the more concerning in view of the complexity and imprecision of the regulation—confounding the courts, let alone litigants. As explained below, however, the Board lacks authority to define the scope of federal jurisdiction, so to the extent the regulation professes to add jurisdictional requirements to those prescribed by Congress, it would appear *ultra vires* for that reason as well.

### C. Whether the Regulation Is Owed Deference

Under the APA, we "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2). And to the extent *Chevron* deference survives, *see supra* note 1, it requires us to first consider whether Congress "directly and clearly spoke[] to the question at issue," in which case "Congress's unambiguous intent controls," but if Congress "[wa]s 'silent or ambiguous,' or . . . 'explicitly left a gap for the agency to fill,'" we consider whether the agency's interpretation was reasonable. *Shalom Pentecostal Church*, 783 F.3d at 164 (quoting *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984)). The Board's regulation fares poorly under either test.

It is true, of course, that "the doctrine of administrative exhaustion should be applied with a regard for the particular

---

and holding that petitioner's failure to file exception before NLRB to ALJ's adverse finding rendered petitioner "jurisdictionally barred from obtaining appellate review of this finding").

12

administrative scheme at issue," *Weinberger v. Salfi*, 422 U.S. 749, 765 (1975), but there is also a "strong presumption that Congress intends judicial review of administrative action," *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986). As the Supreme Court recently observed in *Smith v. Berryhill*, the burden on an agency to rebut that presumption with statutory language or structure is a heavy one, 139 S. Ct. 1765, 1776-77 (2019), and for the same reasons the Court there rejected the argument that the Social Security Administration had "the power to determine 'the scope of the judicial power vested by' [the statute] or to determine conclusively when its dictates are satisfied," *id.* at 1779 (quoting *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 650 (1990)), the NLRB cannot claim that Congress delegated it such power here.

Even accepting that Congress "empowered [the Board] to create a scheme of administrative exhaustion," it "did 'not empower the [agency] to regulate the scope of the judicial power vested by the statute.'" *Id.* at 1778-79 (quoting *Adams Fruit Co.*, 494 U.S. at 650). To the contrary, in Section 10(e), Congress exercised that power itself, requiring only that an objection be "urged before the Board" as a precondition to judicial review. 29 U.S.C. § 160(e). By its plain terms, then, Section 10(e) makes only fair presentation of an issue to the Board a jurisdictional prerequisite, *see Urge*, Webster's New International Dictionary of the English Language (2d ed. 1937) (defining the verb "urge" to mean "to present in an earnest or pressing manner; to press upon attention; to insist upon; to plead or allege"); *Urge*, Webster's 1913, https://www.websters1913.com/words/Urge (last visited Feb. 19, 2024) (defining "urge" to mean "to be pressing in

13

argument; to insist; to persist").[12] And there is no question of *Chevron* deference to the regulation's purported expansion of that jurisdictional bar, for *Chevron* deference "'is premised on the theory that a statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps.' The scope of judicial review, meanwhile, is hardly the kind of question that [we] presume[] that Congress implicitly delegated to an agency." *Smith*, 139 S. Ct. at 1778 (citation omitted) (quoting *King v. Burwell*, 576 U.S. 473, 485 (2015)). So to the extent 29 C.F.R. § 102.46(a)(1) presents its requirements as jurisdiction-stripping, the regulation is

---

[12] The Courts of Appeals have interpreted a number of other statutes' exhaustion requirements phrased similarly to Section 10(e) to require merely fair notice to the agency. *See, e.g.*, *Power Plant Div., Brown & Root, Inc. v. Occupational Safety & Health Rev. Comm'n*, 659 F.2d 1291, 1293-94 (5th Cir. Unit B Oct. 1981) (holding that the issue-exhaustion provision of the Occupational Safety and Health Act of 1970, 29 U.S.C. § 660(a), requires the agency only to be "alerted to the issues" and that "great specificity is not required" (quoting *Cleveland Consol., Inc. v. Occupational Safety & Health Rev. Comm'n*, 649 F.2d 1160, 1165 (5th Cir. Unit B July 1981)); *Phillips v. SEC*, 156 F.2d 606, 608 (2d Cir. 1946) (declining to view § 24(a) of the Public Utility Holding Company Act of 1935 as a limitation on jurisdiction and acknowledging that its purpose was to "prevent surprise"); *Mallory Coal Co. v. Nat'l Bituminous Coal Comm'n*, 99 F.2d 399, 406-07 (D.C. Cir. 1938) (holding that purpose of § 6(b) of the National Bituminous Coal Act was to "secure to the [agency] an opportunity to correct its errors, when attention is properly called thereto").

14

contrary to the statute and beyond the agency's delegated authority. *See id.* at 1778-79.

Viewed as a nonjurisdictional administrative-exhaustion scheme, however, the regulation is within the agency's purview to promulgate. *See id.* at 1777 (recognizing that the SSA "is empowered to define the steps claimants must generally take" to satisfy administrative exhaustion). But even where gap filling is permissible, the agency's response must be "based on a permissible construction of the statute" and not be "unreasonable, arbitrary, capricious, or contrary to the plain language of the [statute]," *Armstrong World Inds., Inc. v. Comm'r*, 974 F.2d 422, 430, 442 (3d Cir. 1992) (quoting *Chevron*, 467 U.S. at 843); *see also* 5 U.S.C. § 706(2)(A) (arbitrary and capricious regulations impermissible under the APA). Yet the widespread confusion in applying 29 C.F.R. § 102.46 and the inconsistency with which it appears to be enforced by the General Counsel, *see supra* Section II(B), suggest the regulation falls into the latter category.

The Board, for example, can use § 102.46(a) as a regulatory shield to protect the agency on appeal and further its policy prerogatives, exercising its discretion to deem parties' arguments forfeited as it pleases, all with the knowledge that its discretion directly affects our ability to hear an argument. *See, e.g.*, *Special Touch Home Care Servs., Inc.*, 349 N.L.R.B. 759, 760 (2007). At the same time, the Board can wield § 102.46 as a regulatory sword, claiming parties forfeited arguments by failing to adhere to Board procedure, even though the General Counsel made no motion before the Board to strike deficient filings for noncompliance and the Board itself elected to proceed below without requiring such strict adherence. And that is precisely what happened here: New

15

Concepts failed to file any exceptions or cross-exceptions, instead providing the Board with a short letter and the brief it filed with the ALJ. But the Board appears to have accepted New Concepts' submission without pushback, and the General Counsel argued his case before the Board without challenging the form of New Concepts' objections. On appeal, however, the General Counsel has pulled the regulatory card, now arguing that New Concepts' failure to file specific exceptions or a motion for reconsideration before the Board "deprives [this] Court of jurisdiction." Answering Br. 24.

Such tactics have serious consequences for parties, who, having invested years litigating unfair-labor-practice claims, may lose their right to appeal due to technicalities, and in such circumstances, the Courts of Appeals may have occasion to question the validity of the regulatory requirements themselves. At a minimum, we should not apply them reflexively. *See, e.g.*, *McCarthy v. Madigan*, 503 U.S. 140, 153 (1992) (refusing to enforce prison-grievance exhaustion requirements against a prisoner, particularly because of their "rapid filing deadlines" that could "trap . . . the inexperienced and unwary inmate, ordinarily indigent and unrepresented by counsel, with a substantial claim"); *Bowen v. City of New York*, 476 U.S. 467, 482-83 (1986) (waiving administrative exhaustion requirements in a class action against the SSA where claimants "would be irreparably injured" if exhaustion were enforced); *Ritz-Carlton Hotel Co v. NLRB*, 123 F.3d 760, 763 (3d Cir. 1997) (concluding that 29 C.F.R. § 102.67(f), providing that failure to request Board review "shall preclude such parties from relitigating, in any subsequent unfair labor practice proceeding, any issue which was, or could have been, raised in a representation proceeding," is an exhaustion requirement that does "not purport to preclude the issues which

16

a reviewing court may consider, and noting that "the Board [would not] have the power to do so").

In sum, whether viewed as *ultra vires* to the extent it purports to impose jurisdictional limitations or unreasonable to the extent it is unclear and inconsistently applied, 29 C.F.R. § 102.46 should be viewed by the courts with skepticism and should be scrutinized by the Board itself for amendment.

## II. Section 10(e)'s Exhaustion Requirement May Not Be Jurisdictional

Four decades ago, the Court held in *Woelke* that Section 10(e)'s exhaustion requirement is "jurisdictional."[13] 456 U.S. at 665-66. Over two decades ago, it again referenced its holding in *Woelke* that "the Court of Appeals lacked jurisdiction to review objections not raised before the [NLRB]." *Sims*, 530 U.S. at 107-08 (citing *Woelke* in discussion of administrative exhaustion in the Social Security Act to illustrate that the "requirements of administrative issue exhaustion are largely creatures of statute"). But in more recent years, the Supreme Court has undertaken to "ward off profligate use" of the term "jurisdictional," *Fort Bend County v. Davis*, 139 S. Ct. 1843, 1849 (2019) (quoting *Sebelius v.*

---

[13] The Courts of Appeals necessarily followed suit. *See, e.g.*, *Kava Holdings, LLC v. NLRB*, 85 F.4th 479, 489 (9th Cir. 2023) (expressly noting that Section 10(e) is jurisdictional); *Intl. Bhd. of Elec. Workers, Local Union 43 v. NLRB*, 9 F.4th 63, 74 n.60 (2d Cir. 2021) (same); *Atl. City Elec. Co.*, 5 F.4th at 307 (same); *Advancepierre Foods, Inc. v. NLRB*, 966 F.3d 813, 818 (D.C. Cir. 2020) (same); *Dolgencorp, LLC v. NLRB*, 950 F.3d 540, 549-50 (8th Cir. 2020) (same).

17

*Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013))—distinguishing between a "'jurisdictional' prescription [that] sets the bounds of the 'court's adjudicatory authority,'" *Santos-Zacaria*, 143 S. Ct. at 1111-12 (quoting *Kontrick v. Ryan*, 540 U.S. 443, 455 (2004)), and a claim-processing requirement that "'promote[s] the orderly progress of litigation' but do[es] not bear on a court's power," *Boechler, P.C. v. Comm'r.*, 142 S. Ct. 1493, 1497 (2022) (quoting *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 435 (2011)).

The distinction matters because "[h]arsh consequences attend the jurisdictional brand." *Santos-Zacaria*, 143 S. Ct. at 1112 (quoting *Davis*, 139 S. Ct. at 1849). Unlike claim-processing rules, "[j]urisdictional requirements cannot be waived or forfeited, must be raised by courts *sua sponte*, and . . . do not allow for equitable exceptions." *Boechler*, 142 S. Ct. at 1497. For that reason, the Court held in *Arbaugh v. Y&H Corp.* that we should impose those consequences only if Congress "clearly states that a threshold limitation on a statute's scope shall count as jurisdictional." 546 U.S. 500, 515-16 (2006). A "plausible or even preferable reading is not enough to make [such] a statement clear." *Jaludi v. Citigroup & Co.*, 57 F.4th 148, 152 (3d Cir. 2023) (citing *Boechler*, 142 S. Ct. at 1499). Rather, because exhaustion is "a quintessential claim-processing rule" that is ordinarily not jurisdictional, "we would need unmistakable evidence, on par with express language addressing the court's jurisdiction." *Santos-Zacaria*, 143 S. Ct. at 1112-13. And if a statute is susceptible to "multiple plausible interpretations . . . —only one of which is jurisdictional—it is difficult to make the case that the jurisdictional reading is clear." *Boechler*, 142 S. Ct. at 1498.

18

Given that high threshold, it is no wonder that the Court, since *Arbaugh*, "ha[s] yet to hold that any statutory exhaustion requirement is jurisdictional when applying the clear-statement rule." *Santos-Zacaria*, 143 S. Ct. at 1112-13 (recounting numerous cases since *Arbaugh* in which the Court declined to classify a statutory requirement as jurisdictional). We, too, in following the Court's instruction to "trea[t] as nonjurisdictional . . . threshold requirements that claimants must complete, or exhaust" for judicial review, *id.* (alteration and omission in original) (quoting *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 166 (2010)), have classified (or, in some cases, reclassified) exhaustion requirements previously considered jurisdictional as nonjurisdictional claim-processing rules.[14]

Section 10(e)'s exhaustion requirement may also be ripe for reconsideration. Indeed, the Sixth Circuit, albeit nonprecedentially, has observed that "[S]ection 10(e)'s exhaustion requirement strikes us as a nonjurisdictional claim-processing rule[]" and has characterized *Woelke* as the type of

---

[14] *See, e.g.*, *Culp v. Comm'r.*, 75 F.4th 196, 202 (3d Cir. 2023) (classifying 26 U.S.C. § 6213's 90-day filing requirement as nonjurisdictional); *Jaludi*, 57 F.4th at 153 (holding that Sarbanes-Oxley Act's statute of limitations and provision requiring petitioners to file administrative complaint before suing are nonjurisdictional); *Holland v. Warden Canaan USP*, 998 F.3d 70, 74 (3d Cir. 2021) (holding § 2244(a) does not bar jurisdiction over successive § 2241 habeas petitions); *United States v. Hart*, 983 F.3d 638, 641-43 (3d Cir. 2020) (classifying the First Step Act's bar on second resentencings as nonjurisdictional); *Guerra v. Consol. Rail Corp.*, 936 F.3d 124, 133-34 (3d Cir. 2019) (holding FRSA statute of limitations provision nonjurisdictional).

"drive-by jurisdictional ruling[]" that the Supreme Court has instructed courts to disregard. *Sysco Grand Rapids, LLC v. NLRB*, 825 Fed. App'x 348, 356-57 (6th Cir. 2020) (internal citations and quotation marks omitted). To ascertain whether Congress intended the exhaustion requirement to be jurisdictional (and, hence, whether *Woelke* has been abrogated), we must consider its "text, context, and relevant historical treatment." *T Mobile Ne. LLC v. City of Wilmington*, 913 F.3d 311, 324 (3d Cir. 2019) (citation omitted).

Starting with the text, Section 10(e) states that "[n]o objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e). Although the statute "speaks to the power of the reviewing *court*, a fact that distinguishes it from many non-jurisdictional requirements addressed only to the *parties*," *Pub. Serv. Co. v. NLRB*, 692 F.3d 1068, 1076 (10th Cir. 2012) (Gorsuch, J.) (emphasis in original), and uses mandatory language like "shall," it is also the case that, without more, "emphatic words are not enough to make a statute jurisdictional," *Guerra v. Consol. Rail Corp.*, 936 F.3d 124, 133 (3d Cir. 2019), and mandatory language like "shall" may be "of no consequence" to the jurisdictional analysis, *United States v. Kwai Fun Wong*, 575 U.S. 402, 411 (2015). It is also telling that the statute is written in the passive voice. *Cf. United States v. Hart*, 983 F.3d 638, 642 (3d Cir. 2020) ("The use of the active voice, making the 'court' the subject, is suggestive but not conclusive" evidence that the statute is jurisdictional). Even the use of "consider," which could send "moderate signals that it is jurisdictional," is not sufficient for a clear statement, as

"Congress can tell a court not to consider a matter without revoking its power to consider it."[15]  *Id.* at 643.

The exhaustion requirement's statutory context within Section 10(e) also indicates it is nonjurisdictional.  As apparent in Attachment A, the first few sentences of Section 10(e) do speak clearly to the jurisdiction of the Courts of Appeals, providing that upon the filing of a petition for review and notice to the respondent, "the court . . . *shall have jurisdiction* of the proceeding and of the question determined therein, and *shall have power* to grant such [relief]."  29 U.S.C. § 160(e) (emphasis added).  In contrast, the exhaustion requirement that follows omits any reference to either jurisdiction or power, stating simply that "[n]o objection that has not been urged before the Board . . . shall be considered by the court, unless . . . because of extraordinary circumstances."  *Id*.  The mere

---

[15] Two other aspects of the text bear mention.  First, while the term jurisdictional "is generally reserved for prescriptions delineating the classes of cases a court may entertain (subject-matter jurisdiction) and the persons over whom the court may exercise adjudicatory authority (personal jurisdiction)," Section 10(e) speaks only in terms of objections to particular *issues*.  *Davis*, 139 S. Ct. at 1849; *see Sysco Grand Rapids*, 825 Fed. App'x at 357 (because Section 10(e) "speaks to the issues courts may consider . . . , not the classes of cases it may entertain" it is likely a claim-processing rule (emphasis omitted)).  Second, Section 10(e) contemplates a carveout for "extraordinary circumstances," which is consistent with a waivable claim-processing rule but not with a jurisdictional requirement.  *See Boechler*, 142 S. Ct. at 1497; *Ruehl v. Viacom, Inc.*, 500 F.3d 375, 384 (3d Cir. 2007).

proximity of this sentence to the prior sentences conferring subject-matter jurisdiction does not suffice; there must be a "clear tie" between the jurisdictional grant and the provision in question, and the "fact that [they] appear in the same provision, [or] even the same sentence" does not amount to a clear statement from Congress.[16] *Boechler*, 142 S. Ct. at 1499; *see Culp v. Comm'r.*, 75 F.4th 196, 201-02 (3d Cir. 2023) (holding there was no clear tie between statutorily imposed deadline and jurisdictional provision). That is especially true where, as here, the remainder of Section 10(e) also delineates such nonjurisdictional claim-processing matters as the "substantial evidence" standard of review and the standard for re-opening the record.[17]

---

[16] In the past, some courts reasoned that the proximity of the exhaustion requirement to Section 10(e)'s jurisdictional grant rendered it a jurisdictional requirement, *see, e.g.*, *Chevron Mining, Inc. v. NLRB*, 684 F.3d 1318, 1329 (D.C. Cir. 2012); *Pub. Serv. Co.*, 692 F.3d at 1076-77 (Gorsuch, J.), but *Boechler* makes clear that alone is not sufficient. *Boechler*, 142 S. Ct. at 1499.

[17] The broader context of Section 10(e) itself reinforces this conclusion. That subsection, which concerns appeals filed by the Board, works in tandem with Section 10(f), which governs appeals filed by the "person[s] aggrieved by a final order of the Board." The latter confers on the Courts of Appeals "the same jurisdiction to grant [relief]" as subsection (e), but groups the exhaustion requirement with other *nonjurisdictional* aspects of the proceeding in stating that "the court shall proceed in the same manner as in the case of an application by the Board under subsection (e)." 29 U.S.C. § 160(f).

That brings us to the exhaustion requirement's historical treatment—the one factor that, as a consequence of *Woelke*, decidedly supports its status as jurisdictional. But the Supreme Court has not reconsidered this provision of Section 10(e) in the 40 years since that case, and, as the Sixth Circuit recognized in *Sysco Grand Rapids*, 824 Fed. App'x at 356-57, its refusal since *Arbaugh* to hold *any* exhaustion requirement jurisdictional under the clear statement rule, *see Santos-Zacaria*, 143 S. Ct. at 1112-13, portends a different outcome when it does.[18]

In short, it is not clear that Section 10(e)'s exhaustion requirement is properly considered jurisdictional at all, but if it is, as the Board continues to assert, that only confirms the propriety of a narrow—not expansive—interpretation in 29 C.F.R. § 102.46 and reinforces the need for the Board to reconsider that regulation.

---

[18] While not dispositive, I note that Congress has made no effort to amend the NLRA to reflect a different understanding. *See Davis*, 139 S. Ct. at 1849 (indicating the Court may opt to "treat a requirement as 'jurisdictional' when 'a long line of [its] decisions left undisturbed by Congress' attached a jurisdictional label to the prescription" (quoting *Union Pac. R.R. Co. v. Bhd. of Locomotive Eng'rs*, 558 U.S. 67, 82 (2009)).

## 29 U.S.C. § 160. Prevention of unfair labor practices

[ . . . ]

### (e) Petition to court for enforcement of order; proceedings; review of judgment

The Board shall have power to petition any court of appeals of the United States, or if all the courts of appeals to which application may be made are in vacation, any district court of the United States, within any circuit or district, respectively, wherein the unfair labor practice in question occurred or wherein such person resides or transacts business, for the enforcement of such order and for appropriate temporary relief or restraining order, and shall file in the court the record in the proceedings, as provided in section 2112 of title 28. Upon the filing of such petition, the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction of the proceeding and of the question determined therein, and shall have power to grant such temporary relief or restraining order as it deems just and proper, and to make and enter a decree enforcing, modifying and enforcing as so modified, or setting aside in whole or in part the order of the Board. No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances. The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive. If either party shall apply to the court for leave to adduce additional evidence and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the hearing before the Board, its member, agent, or agency, the court may order such additional evidence to be taken before the Board, its member, agent, or agency, and to be made a part of the record. The Board may modify its findings as to the facts, or make new findings by reason of additional evidence so taken and filed, and it shall file such modified or new findings, which findings with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive, and shall file its recommendations, if any, for the modification or setting aside of its original order. Upon the filing of the record with it the jurisdiction of the court shall be exclusive and its judgment and decree shall be final, except that the same shall be subject to review by the appropriate United States court of appeals if application was made to the district court as hereinabove provided, and by the Supreme Court of the United States upon writ of certiorari or certification as provided in section 1254 of title 28.

### (f) Review of final order of Board on petition to court

Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business, or in the United

States Court of Appeals for the District of Columbia, by filing in such a court a written petition praying that the order of the Board be modified or set aside. A copy of such petition shall be forthwith transmitted by the clerk of the court to the Board, and thereupon the aggrieved party shall file in the court the record in the proceeding, certified by the Board, as provided in section 2112 of title 28. Upon the filing of such petition, the court shall proceed in the same manner as in the case of an application by the Board under subsection (e), and shall have the same jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper, and in like manner to make and enter a decree enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the order of the Board; the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall in like manner be conclusive.

# ATTACHMENT B

**29 C.F.R. § 102.46. Exceptions and brief in support; answering briefs to exceptions; cross-exceptions and brief in support; answering briefs to cross-exceptions; reply briefs; failure to except; oral argument; filing requirements; amicus curiae briefs.**

(a) Exceptions and brief in support. Within 28 days, or within such further period as the Board may allow, from the date of the service of the order transferring the case to the Board, pursuant to § 102.45, any party may (in accordance with Section 10(c) of the Act and §§ 102.2 through 102.5 and 102.7) file with the Board in Washington, DC, exceptions to the Administrative Law Judge's decision or to any other part of the record or proceedings (including rulings upon all motions or objections), together with a brief in support of the exceptions. The filing of exceptions and briefs is subject to the filing requirements of paragraph (h) of this section

(1) Exceptions. (i) Each exception must:

(A) Specify the questions of procedure, fact, law, or policy to which exception is taken;

(B) Identify that part of the Administrative Law Judge's decision to which exception is taken;

(C) Provide precise citations of the portions of the record relied on; and

(D) Concisely state the grounds for the exception. If a supporting brief is filed, the exceptions document must not contain any argument or citation of authorities in support of the exceptions; any argument and citation of authorities must be set forth only in the brief. If no supporting brief is filed, the exceptions document must also include the citation of authorities and argument in support of the exceptions, in which event the exceptions document is subject to the 50-page limit for briefs set forth in paragraph (h) of this section.

(ii) Any exception to a ruling, finding, conclusion, or recommendation which is not specifically urged will be deemed to have been waived. Any exception which fails to comply with the foregoing requirements may be disregarded.

(2) Brief in support of exceptions. Any brief in support of exceptions must contain only matter that is included within the scope of the exceptions and must contain, in the order indicated, the following:

(i) A clear and concise statement of the case containing all that is material to the consideration of the questions presented.

(ii) A specification of the questions involved and to be argued, together with a reference to the specific exceptions to which they relate.

1

(iii) The argument, presenting clearly the points of fact and law relied on in support of the position taken on each question, with specific page citations to the record and the legal or other material relied on.

(b) Answering briefs to exceptions. (1) Within 14 days, or such further period as the Board may allow, from the last date on which exceptions and any supporting brief may be filed, a party opposing the exceptions may file an answering brief to the exceptions, in accordance with the filing requirements of paragraph (h) of this section.

(2) The answering brief to the exceptions must be limited to the questions raised in the exceptions and in the brief in support. It must present clearly the points of fact and law relied on in support of the position taken on each question. Where exception has been taken to a factual finding of the Administrative Law Judge and the party filing the answering brief proposes to support the Judge's finding, the answering brief must specify those pages of the record which the party contends support the Judge's finding.

(c) Cross-exceptions and brief in support. Any party who has not previously filed exceptions may, within 14 days, or such further period as the Board may allow, from the last date on which exceptions and any supporting brief may be filed, file cross-exceptions to any portion of the Administrative Law Judge's decision, together with a supporting brief, in accordance with the provisions of paragraphs (a) and (h) of this section.

(d) Answering briefs to cross-exceptions. Within 14 days, or such further period as the Board may allow, from the last date on which cross-exceptions and any supporting brief may be filed, any other party may file an answering brief to such cross-exceptions in accordance with the provisions of paragraphs (b) and (h) of this section. Such answering brief must be limited to the questions raised in the cross-exceptions.

(e) Reply briefs. Within 14 days from the last date on which an answering brief may be filed pursuant to paragraphs (b) or (d) of this section, any party may file a reply brief to any such answering brief. Any reply brief filed pursuant to this paragraph (e) must be limited to matters raised in the brief to which it is replying, and must not exceed 10 pages. No extensions of time will be granted for the filing of reply briefs, nor will permission be granted to exceed the 10-page limit. The reply brief must be filed with the Board and served on the other parties. No further briefs may be filed except by special leave of the Board. Requests for such leave must be in writing and copies must be served simultaneously on the other parties.

(f) Failure to except. Matters not included in exceptions or cross-exceptions may not thereafter be urged before the Board, or in any further proceeding.

(g) Oral argument. A party desiring oral argument before the Board must request permission from the Board in writing simultaneously with the filing of exceptions or cross-exceptions. The Board will notify the parties of the time and place of oral

2

argument, if such permission is granted. Oral arguments are limited to 30 minutes for each party entitled to participate. No request for additional time will be granted unless timely application is made in advance of oral argument.

(h) Filing requirements. Documents filed pursuant to this section must be filed with the Board in Washington, DC, and copies must also be served simultaneously on the other parties. Any brief filed pursuant to this section must not be combined with any other brief, and except for reply briefs whose length is governed by paragraph (e) of this section, must not exceed 50 pages in length, exclusive of subject index and table of cases and other authorities cited.

(i) Amicus curiae briefs. Amicus curiae briefs will be accepted only by permission of the Board. Motions for permission to file an amicus brief must state the bases of the movant's interest in the case and why the brief will be of benefit to the Board in deciding the matters at issue. Unless the Board directs otherwise, the following procedures will apply.

(1) The Board will consider motions to file an amicus brief only when: (a) A party files exceptions to an Administrative Law Judge's decision; or (b) a case is remanded by the court of appeals and the Board requests briefing from the parties.

(2) In circumstances where a party files exceptions to an Administrative Law Judge's decision, the motion must be filed with the Office of the Executive Secretary of the Board no later than 42 days after the filing of exceptions, or in the event cross-exceptions are filed, no later than 42 days after the filing of cross-exceptions. Where a case has been remanded by the court of appeals, the motion must be filed no later than 21 days after the parties file statements of position on remand. A motion filed outside these time periods must be supported by a showing of good cause. The motion will not operate to stay the issuance of a Board decision upon completion of the briefing schedule for the parties.

(3) The motion must be accompanied by the proposed amicus brief and must comply with the service and form prescribed by § 102.5. The brief may be no more than 25 pages in length.

(4) A party may file a reply to the motion within 7 days of service of the motion. A party may file an answering brief to the amicus brief within 14 days of issuance of the Board's order granting permission to file the amicus brief. Replies to an answering brief will not be permitted.

(5) The Board may direct the Executive Secretary to solicit amicus briefs. In such cases, the Executive Secretary will specify in the invitation the due date and page length for solicited amicus briefs, and the deadline for the parties to file answering briefs. Absent compelling reasons, no extensions of time will be granted for filing solicited amicus briefs or answering briefs.